308 Ga. 508
FINAL COPY

S20A0056.  SULLIVAN v. THE STATE.

WARREN, Justice.

A jury convicted Antonio Sullivan of malice murder and other crimes in connection with the shooting death of Wava Benton.[1]  On appeal, Sullivan contends that his trial counsel was constitutionally ineffective by failing to present evidence at trial to corroborate Sullivan's testimony about prior difficulties between Sullivan and Benton, and by failing to procure expert testimony about Sullivan's mental health — specifically about post-traumatic stress disorder —

---

[1] The crimes occurred on May 7, 2013.  A Fulton County grand jury indicted Sullivan on September 17, 2013, charging him with malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony.  At a trial held from March 14 to 16, 2016, the jury found Sullivan guilty of all counts.  The trial court sentenced Sullivan to life in prison for the malice murder count and a consecutive term of five years, suspended, for the firearm count; the remaining counts were merged or vacated by operation of law.  Sullivan filed a timely motion for new trial on March 21, 2016, which he amended multiple times through new counsel.  After a hearing, the trial court denied the motion, as amended, on February 28, 2019.  On March 15, 2019, Sullivan filed a timely notice of appeal, and the case was docketed in this Court for the term beginning in December 2019 and submitted for a decision on the briefs.

to be presented to the jury. Because Sullivan has failed to establish that his trial counsel was deficient in either respect, we affirm his convictions.

1. There is no dispute in this case that Sullivan shot and killed an unarmed Benton at the Caribou Apartment complex; multiple eyewitnesses testified that they saw Sullivan shoot Benton, and Sullivan himself admitted it on the stand and continues to admit it on appeal.[2] Viewed in the light most favorable to the jury's verdicts, additional evidence presented at Sullivan's trial showed the following. On the day of Benton's murder, the regional manager of the Caribou Apartment complex, who was sitting in the leasing office, heard a gunshot. When he looked out the window, he saw one man running "in a zigzag" while another man was running behind him shooting. According to the regional manager, the man running in a zigzag got "hit and he went down. . . . And then I saw the shooter go up to the victim one more time and fire one more round and then

_____

[2] On appeal, Sullivan acknowledges that "the jury heard more than sufficient evidence that Mr. Sullivan pulled the trigger."

took off." From the leasing office window, the assistant manager of the complex saw one man running and "then a couple of seconds later I see the man shooting behind him. He must have hit him because he fell on the ground and after that I see him walk up to him and shoot him in the head; popped his hoodie on and took off running." The assistant manager positively identified Sullivan from a photographic lineup as the shooter.

Two residents of the apartment complex who witnessed the shooting also testified at trial. One of the residents testified that she heard a sound like "fire crackers," looked out of her apartment window, and "saw a boy running . . . . And I saw another boy running; shot him in the back. . . . The boy fell, and then he walked up and shot the boy in the head." That resident also positively identified Sullivan from a photographic lineup as the shooter. The other resident testified, "I saw two men running and one fell and the shooter stood over him and shot him two times." She also positively identified Sullivan from a photographic lineup as the shooter.

Sullivan testified in his own defense at trial, and his was the

only testimony or evidence the defense presented. He testified that in 2008, Benton and one of Benton's associates robbed Sullivan at gunpoint. Sullivan also suggested that in early 2013, while Benton was incarcerated, Benton, through his associates, continued to intimidate Sullivan, demanding that Sullivan "put some money on [Benton's] books or something," and emphasizing that "once they got you, they really got you," and they "keep coming at you until you can't take no more." Sullivan also testified that after Benton got out of prison, Sullivan saw Benton at a gas station about a week before the crimes occurred, and Benton told Sullivan, "if you going to be around here," but not "shop[ ] for drugs" from Benton's street gang, then you have to "pay your homage," which Sullivan understood to mean "you've got to give him money; got to give him something."

Sullivan testified that on the day of the shooting, he was leaving the Caribou Apartment complex when Benton and "like five other guys" (all of whom Sullivan said he had seen with guns in the past) confronted him. Benton said to Sullivan, "didn't I tell you not to come around here unless you going to buy from us," and to "give

me what you got," before Benton "grabbed from [Sullivan's] pocket." Sullivan then saw one of the other men "displaying [a] gun," so Sullivan "snatched back and grabbed [his own] firearm off of [his own] waist." Sullivan testified that "[Benton] grabbed my wrist. And as we struggle I fired. I kept firing. He struggled and I kept firing. . . . When I fired the gun went off and he just let go, just ran." Sullivan testified that when Benton ran, "I chased behind him." According to Sullivan, he was shooting as he was chasing Benton. Sullivan testified, "I wasn't thinking. I was just tired." Sullivan further testified that at some point, Benton fell to the ground, and then "I just shot him. I stood over him and shot him."

As to his mental state during the incident, Sullivan testified that he pulled his weapon in the first place because he was "tired. [Benton] going to keep coming. . . . It's not going to stop," and that Sullivan was "scared for my life. Scared if I don't — if I don't deal with it, it's already done. . . . You either do what you got [to] do or you going to get got or your family going to get got." And Sullivan testified that based on his past experience with Benton, "[Benton]

always had a gun." Sullivan admitted that he never saw Benton with a gun that day. And in a custodial interview conducted over a month after the crimes, Sullivan admitted to a detective that he shot Benton, would do it again, and would "piss on [Benton's] grave."

Sullivan does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's general practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Sullivan guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979).

2. Sullivan raises one enumeration of error: that his trial counsel was constitutionally ineffective in two ways: (a) by failing to present the testimony of other witnesses at trial to corroborate Sullivan's testimony about prior difficulties between Sullivan and Benton, and (b) by failing to procure expert testimony about

Sullivan's mental health to be presented to the jury.

To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U.S. at 687-688. This requires a defendant to overcome the "strong presumption" that trial counsel's performance was adequate. *Marshall v. State*, 297 Ga. 445, 448 (774 SE2d 675) (2015) (citation and punctuation omitted). To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U.S. at 694. "A

reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010). Ineffectiveness claims involve mixed questions of law and fact, and "a trial court's factual findings made in the course of deciding an ineffective assistance of counsel claim will be affirmed by the reviewing court unless clearly erroneous," *Green v. State*, 302 Ga. 816, 818 (809 SE2d 738) (2018) (citation and punctuation omitted), whereas conclusions of law based on those facts are reviewed de novo. See *Bright v. State*, 292 Ga. 273, 274 (736 SE2d 380) (2013).

(a) Sullivan contends that his trial counsel was constitutionally ineffective because he failed to call witnesses to corroborate Sullivan's trial testimony about Benton's prior threats to, and harassment of, Sullivan. According to Sullivan, calling witnesses other than himself would have supported the defense's theory that Sullivan acted in self-defense or was guilty of only

voluntary manslaughter. He argues that such evidence was all the more important given that there was no doubt that Sullivan killed Benton in what appeared to be an especially cruel manner.

But "[a] decision as to which defense witnesses to call is a matter of counsel's trial strategy and tactics and will not support a claim of ineffective assistance of counsel unless it is so unreasonable that no competent attorney would have made the decision under the circumstances." *Neely v. State*, 302 Ga. 121, 125 (805 SE2d 18) (2017) (citation and punctuation omitted). And at Sullivan's motion for new trial hearing, trial counsel testified that after receiving a list of potential witnesses from Sullivan and members of his family, trial counsel talked to "between six to eight" potential witnesses, considered each of them, and ultimately made the choice not to call any of them at trial. Trial counsel further explained that although "there could be value" in calling witnesses to corroborate Sullivan's testimony, there was also a risk that their testimony could include information that "might not be in the best interest of the client," and that trial counsel would have made his decision on who to call by

considering "who's the witness, what did they have to offer and what risk . . . is associated with presenting them." Moreover, at the hearing on his motion for new trial, Sullivan called only one witness to support his claim that trial counsel was ineffective for failing to call corroborating witnesses at trial — a friend who testified that he did not witness the 2008 incident when Benton robbed Sullivan, but that he recalled speaking with Sullivan shortly after that incident and that Sullivan was "very mad," arguably supporting trial counsel's concerns about the risk of calling such witnesses. Although trial counsel could have chosen to call additional witnesses, we cannot conclude on this record that his tactical judgment here "was outside the wide range of reasonably effective assistance." *Arnold v. State*, 292 Ga. 268, 272 (737 SE2d 98) (2013) (citation and punctuation omitted); see also, e.g., *Neely*, 302 Ga. at 125-126 (where, at the defendant's motion for new trial hearing, he called only one of the multiple witnesses that he claimed trial counsel should have called at trial, and "trial counsel offered a considered, informed, and reasonable explanation for the decision

not to call witnesses, . . . this Court cannot say that this decision was outside the range of reasonable professional assistance," given the "highly deferential" scrutiny we must apply to counsel's performance) (citation and punctuation omitted); *Johnson v. State*, 295 Ga. 421, 426 (761 SE2d 13) (2014) (trial counsel's decision not to call any witnesses based, in part, on fear of inconsistencies in testimony, was reasonable); *Hall v. State*, 292 Ga. 701, 704-705 (743 SE2d 6) (2013) (trial counsel's decision not to call any witnesses, after speaking with five potential witnesses, was a reasonable trial strategy).

And although Sullivan urges us on appeal to disbelieve trial counsel's assertions that he talked to potential witnesses and decided not to call them at trial, the trial court specifically found that trial counsel "spoke to multiple possible witnesses, whom he ultimately declined to call at trial." Because this finding is supported by the record, it is not clearly erroneous, and we decline Sullivan's invitation to conclude otherwise. See *Green*, 302 Ga. at 818. Because Sullivan has not met his burden of demonstrating that

trial counsel's performance was deficient, his claim fails.

(b)    Sullivan contends that trial counsel's failure to procure and present to the jury expert testimony about Sullivan's mental health and its effect on his criminal responsibility constituted constitutionally ineffective assistance of counsel.  In an effort to establish this claim, Sullivan relies on the testimony of an expert offered at his motion for new trial hearing who diagnosed Sullivan with post-traumatic stress disorder.  Sullivan argues that it was necessary for the jury to hear expert testimony about his post-traumatic stress diagnosis to properly evaluate his criminal liability in this case.

But "the decision whether to present an expert witness," like other decisions about which defense witnesses to call, "is a matter of trial strategy that, if reasonable, will not sustain a claim of ineffective assistance." *Matthews v. State*, 301 Ga. 286, 289 (800 SE2d 533) (2017).  Indeed, for a defendant to establish that a strategic decision constitutes deficient performance, a defendant "must   show   that   no   competent   attorney,   under   similar

circumstances, would have made it." *Martin v. State*, 306 Ga. 747, 751 (833 SE2d 122) (2019) (citation and punctuation omitted). "Moreover, a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Stripling v. State*, 304 Ga. 131, 138 (816 SE2d 663) (2018) (citation and punctuation omitted).

Here, Sullivan's family advised Sullivan's counsel before trial that Sullivan had a history of mental health issues, and trial counsel obtained and reviewed Sullivan's mental health records from Grady Hospital and from the Fulton County jail. As part of his preparation for trial, trial counsel also requested and obtained a psychiatric evaluation to determine whether Sullivan "was mentally competent at the time of the alleged incident," and whether Sullivan was "competent to assist counsel and to stand trial." The psychiatrist who completed Sullivan's evaluation concluded that although Sullivan suffered from depression, cannabis use disorder,

methamphetamine use disorder, and antisocial personality disorder, "at the time of the offense his mental illness did not affect his criminal responsibility" and "at the time of the evaluation, Mr. Sullivan was competent to stand trial."

At Sullivan's motion for new trial hearing, trial counsel acknowledged that in the course of preparing for trial, he came to believe that Sullivan's mental health issues might be relevant to his defense. Trial counsel testified that he remembered receiving and reviewing Sullivan's psychiatric evaluation, and that "part of the purpose of reviewing it is to determine whether or not to call someone, so I would have reviewed it for that purpose, yes, but I don't recall specifically what I decided and why." Trial counsel confirmed that he did not consult further with mental health experts or pursue a mental health defense. About that decision, he testified, "I know ultimately I would have decided that it wasn't something necessary or that would otherwise be in front of [the] jury if it was necessary, but I don't remember specifically as to why, why I determined that it wouldn't be necessary or admissible," but it would

have been a "conscious" decision on his part.

We have explained before that, generally speaking in non-capital cases, a trial counsel's "decision to forego or curtail" further investigation of an accused's mental health, "even when there has been a previous mental hospitalization[,] is reasonable when an expert has determined that the defendant is fit to stand trial or that he was sane at the time of the offense." *Whitus v. State*, 287 Ga. 801, 803-804 (700 SE2d 377) (2010) (citation and punctuation omitted). Here, the expert who performed Sullivan's psychiatric evaluation concluded that Sullivan was "competent to stand trial" and was competent "at the time of the offense." Moreover, the trial court concluded that trial counsel did not perform deficiently in part because trial counsel "obtained mental evaluations [and] consulted medical records."[3] Given this record, even if "other attorneys might

_____

[3] To the extent that Sullivan would seek to offer evidence of post-traumatic stress caused by trauma or abuse that was not inflicted by Benton to support the defense that he was justified in defending himself from Benton, or would seek to offer evidence of a mental disability to support some defense other than insanity, see OCGA § 16-3-2, delusional compulsion, see OCGA § 16-3-3, or self-defense based on battered person syndrome, see OCGA § 16-3-21 (d), such evidence would be inadmissible. See *Virger v. State*, 305 Ga. 281, 297-304 (824 SE2d 346) (2019).

have explored the mental issue further, we cannot conclude that the investigation by and tactical judgment of Appellant's attorney was outside the wide range of reasonably effective assistance." Id. at 804 (citation and punctuation omitted); see also, e.g., *Whitus*, 287 Ga. at 804 (trial counsel who "requested and obtained a full psychiatric evaluation of Appellant" was not deficient for relying on that evaluation and deciding not to request additional testing or to pursue an insanity defense); *Arnold*, 292 Ga. at 269-271 (where trial counsel "obtained and reviewed the available mental health records, discussed the matter with a mental health professional who previously had evaluated and treated [the defendant], and confirmed that [the defendant] had received no additional treatment for mental health issues," trial counsel's strategic decision to not obtain a psychological evaluation to assess the defendant's "competence to stand trial, [and] whether he might have a viable insanity defense" was not deficient); cf. *Scott v. State*, 301 Ga. 573, 576-578 (802 SE2d 211) (2017) (where trial counsel was aware that defendant "was extraordinarily distraught after shooting [the

victim] and repeatedly implored responding officers to shoot and kill her," and where defendant's "family suggested to trial counsel that she had mental illness and gave him medical records" reporting a "history of serious mental illness related to violence against the same person on a prior occasion" and that she had previously "hear[d] a voice telling her to 'kill,'" counsel's decision to forgo a mental evaluation of defendant based on counsel's own interactions with her was unreasonable and therefore deficient).

Although Sullivan complains that trial counsel should have "explain[ed] how his client's mental health condition would have fueled his fear of Benton and his criminal company," and that "more was needed," this is not a case where trial counsel "'made *no* effort' to investigate the potential for a defense . . . based on mental health issues" or "relied exclusively upon [his] own lay evaluation of the mental health of [his] client." *Arnold*, 292 Ga. at 271 (citation omitted; emphasis in original). And Sullivan's presentation of new expert testimony at the motion-for-new-trial stage diagnosing him with post-traumatic stress disorder and opining about its potential

effect on Sullivan's mental state when he shot and killed Benton does not transform trial counsel's constitutionally adequate performance into deficient performance. See *Matthews*, 301 Ga. at 288-289 (defendant's presentation of expert testimony at motion for new trial hearing did not demonstrate that trial counsel's decision to not engage and present an expert witness at trial was deficient). Sullivan's claim of ineffective assistance of counsel therefore fails.

*Judgment affirmed. All the Justices concur.*

DECIDED APRIL 20, 2020.
Murder. Fulton Superior Court. Before Judge Dunaway.
*Lauren B. Shubow, Stephen R. Scarborough*, for appellant.
*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Kevin C. Armstrong, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.