NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: October 4, 2022

S22A0735. PARK v. THE STATE.

LaGrua, Justice.

Appellant Dongsoo Park ("Appellant") was convicted of malice murder in connection with the stabbing death of Kwang Ko ("Ko") in a parking lot after a confrontation between two groups of people.[1] On appeal, he contends that (1) the trial court erred by failing to instruct the jury on justification as part of the former suggested

---

[1] Ko was killed on December 8, 2011. On February 29, 2012, a Gwinnett County grand jury indicted Appellant, Dong Ho Shin, Seung Won Lee, and Yeon-Tae Kang Hill for malice murder, felony murder, and aggravated assault. Appellant was tried separately from June 3 to 11, 2019, and the jury found Appellant guilty of all counts. Appellant was sentenced to serve life in prison without the possibility of parole for malice murder. The felony murder count was vacated by operation of law, and the trial court merged the aggravated assault count into the felony murder count. See Division 3, below. Appellant filed a timely motion for new trial. In June 2021, the trial court held hearings on the motion for new trial. On January 5, 2022, the trial court denied the motion for new trial. Appellant filed a timely notice of appeal, and the case was docketed to this Court's April 2022 term and submitted for a decision on the briefs.

pattern jury instruction on mutual combat; (2) his trial counsel provided ineffective assistance of counsel; and (3) the trial court erred in merging the aggravated assault count into the felony murder count. We affirm.

The evidence showed that on December 8, 2011, at approximately 7:00 a.m., the body of an unidentified man was discovered in the Aldi's parking lot in Duluth. The man was ultimately identified as Ko. The medical examiner later determined that Ko had been stabbed or cut at least seven times by a sharp object and had other blunt-force injuries. Ko's fatal wound was a cut to his neck that severed both internal jugular veins.

Earlier on December 8 around 4:00 a.m., Appellant and his friends, Seung Won Lee ("Lee"), Dong Ho Shin ("Shin"), and Yeon-Tae Kang Hill ("Hill"), had dinner and drinks at a restaurant in the same shopping center as the Duluth Aldi's. Ko and Jin Oh ("Oh")[2] were also dining at the same restaurant, and the restaurant owner

---

[2] Although counsel—for both parties—mentioned during opening statements and closing arguments that Oh and Ko had dinner that night, no one testified to this fact at trial.

testified that she did not see any interaction between the men at the two tables. After finishing their meal, Appellant's group called two taxis—Shin planned to drive himself home—and then went outside to smoke.

While Appellant's group was outside smoking, Ko and Oh left the restaurant. Shin testified that either Ko or Oh asked Shin and his group of friends, "What are you looking at?" in a sarcastic manner; Hill testified that this same person "smirked" at them, with "a smile that makes you feel uncomfortable, mistreated." Ko and Oh then walked to the parking lot and got into a car.

According to Hill, Appellant stated that he knew Ko and Oh and walked over to their car and knocked on the passenger-side window, where Ko was seated. Appellant told "them to come out from [Oh's] car." Around this same time, a taxi driver arrived in the parking lot. He testified that seven or eight people "were talking, sort of making verbal confrontation to each other."

Hill testified that Appellant attempted to stop Oh's car by standing in front of it; the taxi driver testified that two men stood in

3

front of the car. Both Hill and the taxi driver testified that Oh's car "was still moving" when either Appellant or two men stood in front of the car. Hill testified that Appellant "was holding onto the hood" when the driver of the car "pressed . . . the gas pedal" and "some part of [Appellant's] body was under the car, as he tried to hold onto the hood." The taxi driver also testified that one of the men who stood in front of the car went "under the car." Lee and Shin testified that they did not see what happened prior to Appellant getting hit by Oh's car because they were busy having a conversation, but they both witnessed Appellant "under the car."

The taxi driver testified that after Appellant was hit by Oh's car, the other man who was standing in front of the car went to the driver's door "to take [the driver] out from the car" and the "two people who were standing next to the restaurant" ran to the driver's door "to assist." Lee and Shin both testified that they ran over to the car, opened the driver-side door, and tried to get the driver out.

Hill testified that while Lee and Shin were attempting to remove Oh from the car, Ko got out of the car and "grabbed"

4

Appellant. Appellant and Ko "were literally onto their bodies together, fighting, and they slowly, slowly made their way to the [Aldi's] parking lot." Oh was not removed from the car and ultimately drove away.

The taxi driver testified that after Oh's car left the parking lot, the people who had attempted to remove the driver from the car ran over to the adjacent Aldi's parking lot. There were a total of "five or six" people in the Aldi's parking lot and "they were all tangled together." The taxi driver then received an order from his employer to leave, so he left.

Lee, Shin, and Hill each testified differently than the taxi driver as to who was in the Aldi's parking lot. According to Hill, only Appellant and Ko were "tangled up" in the Aldi's parking lot, and he did not see either one of them with a knife. Someone screamed, "Let's go," and Appellant, Shin, Lee, and Hill ran to Shin's car.

Lee testified that he ran after Oh's car as it was leaving the premises "to chase [it]." After he failed to catch the car, he saw Appellant and Ko standing in the Aldi's parking lot. He testified

that: "It appear[ed] . . . there's going to be a fight, you know, heating up. So let's not fight. Let's go." Appellant, Shin, Lee, and Hill then got into Shin's car.

Shin testified that he saw only Appellant and Ko in the Aldi's parking lot; Appellant was standing, and Ko "was kind of sitting in a squat position." Shin "didn't want to get into a conflict, so [he] shouted to them from [a]far, [l]et's go home." Appellant started walking toward him, and Appellant, Shin, Lee, and Hill got into Shin's car. Shin further testified that he, Lee, and Hill were never in the Aldi's parking lot.

Shin, Lee, and Hill testified that Shin drove the foursome to his apartment complex and that Appellant sat in the backseat. During the five-to-ten-minute car ride, Shin, Lee, and Hill asked Appellant whether he was injured. According to Lee, Appellant stated "he was okay, but he was frightened." Lee, Shin, and Hill testified that when they arrived at Shin's apartment complex, they all started smoking in the parking lot. Hill testified that he noticed that Appellant's pants were "ripped here and there." Lee testified

6

that Appellant asked: "Where's my bag? Did I leave it in [Shin's] car?" Appellant then "took the bag out of [Shin's] car and went to the back of the apartment [building]." When Appellant came back, he showed everyone that he was wounded. Lee testified "[t]here was blood and then there's some scratches." Lee and Appellant left in a taxi, and Hill slept at Shin's apartment that night.

When Sergeant William Petty arrived at the Aldi's parking lot that morning, he recovered Ko's cell phone and called his recent contacts, one of whom was Oh.[3] After speaking with Oh, Sergeant Petty went to Star Daepo, a restaurant, where he learned that Shin and Lee were employees and present on-site and that Appellant was a former employee. Sergeant Petty asked Shin and Lee to speak with him at the police station; both agreed.

The next day, on December 12, Shin drove to the police station. His car was processed for evidence, and Ko's blood was discovered in the backseat where Appellant had been sitting. After Sergeant Petty

---

[3] Sergeant Petty testified that Oh had been deported, and his deportation order was admitted at trial. Oh therefore did not testify at trial.

interviewed Shin, the police conducted a search of Shin's apartment and recovered a "black-handled knife with a sheath" from inside a drawer in his bedroom. Forensic testing of this knife revealed no evidence of blood, or the fingerprints of Appellant, Lee, Shin, or Hill. The police also conducted a search of the apartment complex's grounds for a knife or other evidence, but did not find anything. On December 13 and 19, Sergeant Petty interviewed Lee and Hill, respectively.

Less than 24 hours after Ko's body was discovered, Appellant arrived at the Atlanta airport and purchased a one-way ticket to Seoul, South Korea; his flight departed Atlanta on December 9, 2011, at 12:30 a.m. After Appellant, Shin, Lee, and Hill were indicted in 2012 for malice murder and related crimes, Appellant was eventually extradited in 2018 from South Korea to Gwinnett County.

At trial, the defense's theory of the case was that after Appellant was hit by Oh's car, he remained on the ground until he left in Shin's car. In addition to their testimony recounted above,

8

Shin, Hill, and Lee testified that their charges for Ko's murder were still pending and they had received no deal from the State in exchange for their testimony, but they had received testimonial immunity.

Min-Hyuk Lee ("Min-Hyuk"), the manager of Star Daepo where Shin and Lee worked and Appellant formerly worked, testified that on the morning of December 8 he received a phone call from the owner of the restaurant where Appellant and his friends had eaten dinner. Based on this conversation, he drove to Shin's apartment where he met with Shin, Appellant, and Lee.[4] Min-Hyuk asked them: "I was told that someone passed away . . . So what happened?" No one responded. Appellant then said: "What am I going to do . . . now?" and "Do I need to go hide?" Min-Hyuk then asked him, "Where is the knife?" Min-Hyuk testified that he asked Appellant about a knife because he "knew [Appellant] had a knife in his bag" since Appellant once showed everyone at Star Daepo "how to cut . . . raw fish." Appellant responded that he "put [the knife] away around

_____

[4] Min-Hyuk testified that he was not sure if Hill was also present.

9

somewhere."

Appellant did not testify at trial, but the State played recordings of several phone calls made by Appellant to his mother, Oksoon Robinson ("Robinson"), while he was in jail.[5] During one phone call, Appellant explained, "Since I have no memory, there's much I could not see, whether everything [everyone else said was] correct." During another phone call, Appellant stated, "What [Shin, Lee, and Hill] are saying are all lies," and "the guys coordinated their stories" because "[t]heir stories are so similar." He also pointed out that one of the taxi drivers said "that he saw [four] or [five] people standing together, saw them fighting while standing, but didn't mention anything about one person lying down" and that "[e]veryone does agree about [him] getting hit by the car and falling." Additionally, Appellant stated:

> [T]here are a lot of things that the guys say that don't match up with what the taxi driver says. The guys said that they didn't hit at all. [Hill] says that he was out of it so that he didn't get involved at all, and [Lee] and [Shin] gave false statements that they didn't see [inaudible]

---

[5] Appellant and Robinson spoke in Korean on the phone calls, and the jury was provided with a translated transcript.

10

going towards the dead person, but the taxi driver is saying that he saw all of them standing there together, so that's also a lie.

Robinson asked: "So is [the taxi driver] saying that you were there when the fight broke out? You weren't." Appellant then responded: "I wasn't. Not that I wasn't but when I was getting beat up, they came to help me, so from his perspective, it could seem like we were all fighting together. Since the guys came to help me as I was getting beat up."

The defense called two character witnesses and Ki Song Kim ("Kim"), Shin's cellmate for two months in 2013. According to Kim, Shin explained he was in custody because "there was a fight and there was a car [that was] involved and how it had hit [Appellant]" and Appellant went "under the car." Shin also told Kim that Appellant remained on the ground until he was "placed" in Shin's car. After Shin, Lee, and Appellant got into the car, "this one black shadow f[e]ll down in front of their car. And later, [Hill] got into the car, and they left."

1. Appellant contends that the trial court erred by failing to

instruct the jury on justification as part of the then-current pattern jury instruction on mutual combat. Specifically, he contends that the trial court should have read the part of the instruction that pertained to justification, which stated:

> Under some circumstances, such killing . . . may be justifiable.
>
> . . .
>
> The killing as a result of mutual combat may be justifiable, and you may find it to be so if it appears that the defendant reasonably believed at the time of the killing that the force the defendant used was necessary to prevent death or great bodily injury to the defendant (or a third person) or to prevent the commission of a forcible felony, and if it further appears that the deceased was the aggressor. If it appears that the deceased was not the aggressor but that the defendant was the aggressor, then in order for the killing to be justified, if such killing was the result of mutual combat, it must further appear that the defendant withdrew from the encounter and effectively communicated to the deceased the intent to do so, and the deceased, notwithstanding, continued or threatened to continue the use of unlawful force.

During the charge conference, Appellant's trial counsel requested the pattern jury instruction on mutual combat, and the State objected to the justification language.[6] The trial court declined

---

[6] We note that Appellant requested the pattern jury instructions on

12

to instruct the jury with this language, finding that the evidence did not support it. Assuming without deciding that the trial court erred in failing to instruct the jury with the mutual combat justification language, we conclude that any error was harmless.

"The test for determining whether a nonconstitutional instructional error was harmless is whether it is highly probable that the error did not contribute to the verdict." *McIver v. State*, 314 Ga. 109, 140 (2) (h) (875 SE2d 810) (2022) (citation and punctuation omitted). "In determining whether a trial court erred in giving jury instructions, we read and consider the instructions as a whole." *Stafford v. State*, 312 Ga. 811, 820 (4) (865 SE2d 116) (2021) (citation and punctuation omitted). "And in determining whether such an error is harmless, we assess the evidence from the viewpoint of reasonable jurors, not in the light most favorable to the verdicts." *McIver*, 314 Ga. at 140 (2) (h). Where the defense of justification "is supported by only the slightest evidence and is inconsistent with the

mutual combat, lesser offense, and voluntary manslaughter, and he did not request the pattern jury instructions on affirmative defense or justification.

13

defendant's own account of the events or with the main defense theory presented at trial, the failure to give a charge on the defense generally will be harmless in any event." *Guerrero v. State*, 307 Ga. 287, 288-289 (2) (835 SE2d 608) (2019) (citation and punctuation omitted).

Here, the trial court instructed the jury on mutual combat—minus the justification language—and voluntary manslaughter. As part of these pattern jury instructions, the jury was instructed:

> After consideration of all the evidence, before you would be authorized to return a verdict of guilty of malice murder or felony murder, you must first determine whether mitigating circumstances, if any, would cause the offense to be reduced to voluntary manslaughter.
>
> A person commits voluntary manslaughter when that person causes the death of another human being under circumstances that would otherwise be murder, if that person acts solely as the result of the sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person.
>
> . . .
>
> If you find that there was a mutual intention on the part of both the deceased and the defendant to enter into a fight or mutual combat and that under these circumstances the defendant killed the deceased, then ordinarily such killing would be voluntary manslaughter, regardless of which party struck the first blow.

"Qualified jurors under oath are presumed to follow the instructions of the trial court." *Hill v. State*, 310 Ga. 180, 190 (7) (850 SE2d 110) (2020) (citation and punctuation omitted). Because the jury was charged on voluntary manslaughter and mutual combat yet returned a guilty verdict on malice murder and felony murder, it follows that the jury likely considered and rejected the factual basis underpinning the first step of finding justification by mutual combat, i.e., that Appellant was engaged in mutual combat. Based on (1) the jury's rejection of mutual combat—which was inconsistent with Appellant's own version of events, (2) the compelling evidence of Appellant's guilt—i.e., that Ko's blood was found in the backseat of Shin's car where Appellant was sitting, that Appellant was wounded, appeared to hide his bag after the incident, was known to carry a knife, and stated that he hid the knife, and that Appellant flew to South Korea less than 24 hours after the incident, and (3) there was no more than slight evidence of justification, we conclude that any error here did not likely affect the outcome of the trial court

proceedings. See *State v. Newman*, 305 Ga. 792, 797-798 (2) (a) (827 SE2d 678) (2019) (the trial court's failure to instruct the jury on the defense of habitation was harmless where there was compelling evidence of the defendant's guilt and the jury was instructed on self-defense and accident and rejected those defenses). Accordingly, this claim fails.

2. Appellant contends he received constitutionally ineffective assistance of counsel in multiple ways. To prevail on these claims, Appellant must demonstrate that his trial counsel's performance was professionally deficient and that he was prejudiced by this deficient performance. See *Sullivan v. State*, 308 Ga. 508, 510 (2) (842 SE2d 5) (2020) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To establish deficient performance, Appellant must show that trial counsel performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms. See id. Establishing deficient performance

is no easy showing, as the law recognizes a strong

16

presumption that counsel performed reasonably, and [Appellant] bears the burden of overcoming this presumption. To carry this burden, he must show that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not. In particular, decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Vann v. State*, 311 Ga. 301, 303 (2) (857 SE2d 677) (2021) (citations and punctuation omitted).

To establish prejudice, Appellant must prove that there is a reasonable probability that, but for his trial counsel's deficiency, the result of the trial would have been different. See *Sullivan*, 308 Ga. at 510 (2). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (citation and punctuation omitted). "And, this burden is a heavy one." *Bates v. State*, 313 Ga. 57, 62-63 (2) (867 SE2d 140) (2022*)* (citation and punctuation omitted). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." Id. at 63 (2).

(a) Appellant contends that his trial counsel provided

constitutionally ineffective assistance by failing to impeach Min-Hyuk with an alleged violation of a court order to excuse himself during Oh's deposition testimony. For the reasons explained below, this claim of error fails.

On December 13, 2012, a judge presided over Oh's deposition in a courtroom.[7] Counsel for the State, Hill, Lee, and Shin were present, and they asked that any potential witnesses for trial leave the courtroom. Hill's counsel noted that there were four people present in the courtroom. The judge stated, "I don't know who these folks are, but if you believe that any one of these individuals might be a witness at trial, then I'm going to ask you to ask that individual to leave the courtroom." Counsel then conferred with the people in the courtroom, and Shin's counsel stated that "some of these young people might be called . . . [at] sentencing, because they are friends." The judge stated she did not have an issue with people remaining for Oh's deposition if they were only going to be called at sentencing.

---

[7] In August 2012, the State moved to depose Oh to preserve his testimony in the event he was deported before trial.

18

Their names were put on the record, and Min-Hyuk was one of them.

Oh testified at his deposition that he and Ko had dinner, they left the restaurant without speaking to anyone and got into Oh's car. Someone unknown to him then "blocked" his car from leaving the parking lot by standing in front of it near the passenger-side. Oh inched his car forward, and the man moved out of the way. Then, someone opened Oh's car door; a different man punched Oh and attempted to pull him out of his car. Then Ko was "pulled out" of the passenger side of the car, and Oh drove off. Oh went home and called Ko several times, until the police called him later that afternoon.

At the motion-for-new-trial hearing, both of Appellant's trial counsel testified that they reviewed Oh's deposition transcript prior to trial, but they did not recall whether Min-Hyuk was present at the deposition in the courtroom. Lead trial counsel testified that if he had known Min-Hyuk was present at Oh's deposition, he would have "tried to get the [trial court] to restrict [Min-Hyuk's] testimony based on a violation of the [order], or at least . . . make it known to the jury that there was something improper in his testimony."

Second-chair counsel testified that if Min-Hyuk was present, he would have used Min-Hyuk's alleged violation of the court order to impeach him during trial.

"[T]he purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion." *Davis v. State*, 299 Ga. 180, 185 (2) (787 SE2d 221) (2016) (citation and punctuation omitted). "A party's remedy for a violation of the rule is to request the trial court to charge the jury that the violation should be considered in determining the weight and credit to be given the testimony of the witness." *Szorcsik v. State*, 303 Ga. 737, 741-42 (3) (814 SE2d 708) (2018) (citation and punctuation omitted).

Assuming without deciding that Min-Hyuk violated the court's order and Appellant's trial counsel provided constitutionally deficient assistance by failing to impeach Min-Hyuk with evidence that he was present at Oh's deposition and by failing to request an instruction on Min-Hyuk's alleged violation, we turn to whether Appellant suffered prejudice because of that presumed deficiency—

20

that is, whether he has demonstrated that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different.

The record shows that the testimony of Oh—at his deposition in 2012—and Min-Hyuk—at trial in 2019—contained no common elements. The testimony of Oh concerned what occurred in the parking lot of the restaurant; the testimony of Min-Hyuk concerned what occurred when he arrived at Shin's apartment the morning of the altercation in the parking lot and on the question of whether Appellant had a knife. And Oh never testified that he saw anyone with a knife during the confrontation in the parking lot. The testimony of Min-Hyuk does not match that of Oh, and Appellant has failed to demonstrate any evidence that could have been argued to the jury as showing fabrication by Min-Hyuk or collusion between him and Oh. Appellant has thus failed to show that there is a reasonable probability the result of his trial would have been different had Min-Hyuk been impeached with his presence at Oh's deposition, which occurred seven years earlier. Accordingly, this

claim fails.

(b) Appellant contends his trial counsel provided constitutionally ineffective assistance by failing to present any evidence to explain Appellant's flight to South Korea. For the reasons explained below, we disagree.

"[I]t is well settled that the determination of which witnesses to call is a matter of trial strategy and tactics, and such strategic and tactical decisions do not amount to deficient performance unless they are so unreasonable that no competent attorney would have made them under similar circumstances." *Butler v. State*, 313 Ga. 675, 684 (4) (b) (872 SE2d 722) (2022) (citation and punctuation omitted). And "deciding whether to call a witness . . . is normally considered a matter of strategy based in part on counsel's assessment of whether the witness would be credible[.]" *Gramiak v. Beasley*, 304 Ga. 512, 523 n.5 (820 SE2d 50) (2018).

During his opening statement, Appellant's counsel stated that after Appellant arrived in South Korea in 2011, he had surgery due to his injuries from being struck by the car, obtained his college

degree, completed his military service, had a job, and was preparing to buy a house. However, no such evidence was presented at trial.

At the motion-for-new-trial hearing, Robinson testified that Appellant was already preparing to return to South Korea in December 2011 "for school" and that the "quarrel" was "a good opportunity" for Appellant to return, particularly because Appellant's student visa had expired. She further testified that upon returning to South Korea, Appellant went to university, completed his military obligation, joined the reserve forces, and had a job. Robinson's now-husband testified that he began dating Robinson in October 2011 and she told him that "[Robinson and Appellant] were both planning on going back to [South] Korea at some point[.]"

Appellant's lead counsel testified that there was not "much of a plan" to present evidence to explain Appellant's flight to South Korea, absent Appellant testifying to "explain[] the timing and the reason[] for his trip." He spoke with Robinson and "didn't put a whole lot of stock in what she was saying and so . . . [they] made the decision not to press forward[.]" Additionally, he testified that

23

"[Robinson's] testimony . . . might also open up a bigger can of worms" and could have done "a lot more damage than good" because "clearly [she] would have known through police contacts that the State was looking for [Appellant]." Lead counsel admitted "that the timing of [Appellant's] trip [was] quite problematic" and "was the elephant in the room." Ultimately, counsel "didn't find a good way to deal with it," and "[i]t was just one of those facts out there that [counsel] just . . . had to . . . dance around." Once Appellant decided not to testify, lead counsel stated that the plan was to "not talk about [Appellant's flight to South Korea]." Appellant's second-chair counsel testified that without Appellant's testimony at trial, there was no alternative plan to explain his flight to South Korea.

Given lead trial counsel's concerns about Robinson's credibility and that her testimony may have been harmful, we cannot say that the strategic decision not to call her at trial was patently unreasonable. See *Atkinson v. State*, 301 Ga. 518, 526-527 (6) (h) (801 SE2d 833) (2017) (trial counsel "made a reasonable strategic decision not to call" a witness when she had concerns "that he might

24

not be a credible witness"); *McDuffie v. State*, 298 Ga. 112, 116 (2) (779 SE2d 620) (2015) (concluding that the appellant failed to show that trial counsel's "strategic decision not to call" a certain witness was "entirely unreasonable" when trial counsel was concerned that the witness would be "more harmful than helpful"). Additionally, Appellant has failed to establish that the testimony of Robinson's husband would have been admissible at trial under an exception to the hearsay rule. See *Mosby v. State*, 300 Ga. 450, 454 (2) (796 SE2d 277) (2017) ("Deficient performance of counsel is not shown by trial counsel's failure to present a witness whose testimony would have been inadmissible."). Accordingly, this claim fails because Appellant has not established that trial counsel performed deficiently.

(c) Appellant contends his trial counsel provided constitutionally ineffective assistance by failing to object to evidence of the knife found in Shin's apartment because it was irrelevant. Assuming without deciding that counsel was deficient, we turn to whether Appellant has demonstrated that there is a reasonable probability that, but for his trial counsel's deficiency, the result of

the trial would have been different, see *Sullivan*, 308 Ga. at 510 (2), and we conclude he has not.

While the knife was not particularly probative, it was also not particularly prejudicial, because it did not incriminate Appellant. As the prosecutor stated during closing argument: "The police took out a search warrant and went to Shin's residence and found a knife that has no blood on it, *unrelated to the crime* . . . [Appellant's] fingerprints are not on it. . . We tested everything we possibly could get our hands on." (Emphasis added.) Thus, Appellant has failed to show that there is a reasonable probability the result of his trial would have been different had his counsel objected. See *Varner v. State*, 306 Ga. 726, 735 (3) (d) (832 SE2d 792) (2019) ("Pretermitting whether counsel should have objected to [the discovery of a shotgun that was not connected to any of the charged crimes], there is no reasonable probability that it affected the outcome of [the] trial."). Accordingly, this claim fails.

3. Appellant contends the trial court erred by merging the aggravated assault count into the felony murder count, which was

26

vacated by operation of law. We agree. See *Marshall v. State*, 309 Ga. 698, 700 (2) (848 SE2d 389) (2020) ("[T]he aggravated assault [count] should have merged into the malice murder conviction, not the vacated felony murder count."). "However, because [this] merger error[] make[s] no practical difference . . . we decline to correct [it] here." Id.

4. Finally, Appellant contends that the cumulative effect of his counsel's ineffective assistance amounted to prejudice. See *Bates*, 313 Ga. at 69 (3) ("It is the prejudice arising from counsel's errors that is constitutionally relevant, not that each individual error by counsel should be considered in a vacuum." (citation and punctuation omitted)). For purposes of this analysis, we have assumed two deficiencies on the part of trial counsel—the failure to impeach Min-Hyuk with an alleged violation of a court order to excuse himself during Oh's deposition testimony and the failure to object to the knife found in Shin's apartment, which was not incriminating—and assumed one trial court error—the failure to instruct the jury on the justification language contained within the

mutual combat jury instruction—but we have concluded that each was harmless. Given our conclusions above and even assuming that all of these errors should be considered cumulatively under *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020),[8] we conclude that Appellant has failed to establish that the "combined prejudicial effect" of these errors "requires a new trial." Id. at 21 (4). "We have yet to decide how multiple standards for assessing prejudice may interact under cumulative review of different types of errors, but we need not do so here, because [Appellant's] claims of cumulative prejudice fail under even the higher standard implicated by these errors." *Pender v. State*, 311 Ga. 98, 120 (6) (856 SE2d 302) (2021).

*Judgment affirmed. All the Justices concur.*

---

[8] "*Lane* involved only evidentiary issues, which usually are easily cumulated." *Jones v. State*, ___ Ga. ___, ___ n.9 (5) (2022 WL 4349303) (Case No. S22A0548, decided Sept. 20, 2022). "We made explicit in *Lane* that some other types of error may not allow aggregation by their nature, but that question is not presented here." Id. (citation and punctuated omitted). "And we stated that if a defendant in a future case seeks to argue to the reviewing court that he is entitled to a new trial based on the cumulative effect of errors outside of the evidentiary context, he would do well to explain why cumulative error should be extended beyond the evidentiary context." Id. (citation and punctuation omitted). Here, Appellant makes no argument as to why we should apply *Lane*'s cumulative error approach in this new context, much less how we might aggregate harm from a jury instruction with harm from two unrelated evidentiary decisions.