**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the
# Supreme Court of Georgia

No. S26A0547
Antonio Williams
v.
The State

On Appeal from the Superior Court of DeKalb County
No. 20CR2680

Decided: June 2, 2026

MCMILLIAN, Justice.

Antonio Williams appeals from his convictions for malice murder and other crimes in connection with the stabbing death of his mother, Terri Alexander.[1] Williams asserts that (1) he received constitutionally ineffective assistance of counsel when his counsel failed to adequately explore Williams's mental health and

---

[1] The crimes were committed on March 5, 2020. In December 2020, a DeKalb County grand jury indicted Williams for malice murder (Count 1), felony murder (Count 2), aggravated assault-family violence (Count 3), and possession of a knife during the commission of a felony (Count 4). At a jury trial held in February 2024, Williams was found guilty on all counts. The trial court sentenced Williams to serve life in prison for malice murder (Count 1) and a consecutive five-year term in prison for possession of a knife during the commission of a felony (Count 4); the remaining counts either merged for sentencing purposes or were vacated by operation of law. Williams timely filed a motion for new trial, which was amended by new counsel in June 2025. Following an evidentiary hearing, the trial court denied the motion for new trial, as amended, on July 17, 2025. Williams timely filed a notice of appeal, and his case was docketed to the term of this Court beginning in December 2025.

(2) the trial court erred by failing to sua sponte inquire into Williams's competency to stand trial. Because the record belies each of these enumerations, we affirm.

In 2019, Williams came to live with Alexander in DeKalb County while she tried to get him medical treatment for his paranoid schizophrenia. On February 25, 2020, Alexander contacted 911 for assistance with Williams, and a mobile crisis unit responded to her home.[2] Alexander explained that Williams became upset with her when she asked him to clean his bathroom. The responding officer testified that Williams was "on the floor, and he was agitated." Williams said he was "hallucinating and hearing voices." The members of the mobile crisis unit ultimately determined that Williams needed to be hospitalized based on his diagnosed schizophrenia and failure to take his prescribed medication.

Williams, who had been hospitalized several times before, did not want to go, but he was transported to Grady Hospital in handcuffs for an involuntary 72-hour hold. Williams remained hospitalized there until March 4, 2020. Cell phone records showed that Alexander's cell phone received several calls from Grady Hospital in the early morning hours on the day that Williams was released. Alexander's cell phone then traveled to Grady Hospital around 10:00 a.m. that morning, stopped at Walmart briefly, and returned to her home around 11:30 a.m. Her cell phone did not travel anywhere else that day, and the last outgoing call was made at 11:50 a.m.

Around 6:00 p.m. on March 5, Alexander's next-door neighbor, Gerdean James, was outside saying goodbye to a friend when Williams ran up to her friend's car and said something to her

---

[2] A recording of her 911 call was played for the jury at trial.

friend. The friend shoved Williams and drove away. James went inside her house and watched Williams walk to another neighbor's house before coming back to her front door. James kept her door locked and did not answer when Williams rang the doorbell. When Williams did not leave, James opened the door and asked if she could help him. Williams held up his phone, told her it was dead, and then said, "[I]t's my mom. My mom is sick[.]" James called 911 and handed the phone to Williams. James described Williams as "well-dressed, clean," and "very calm." After the call, Williams "quietly walked" away. James told the 911 operator to send the police because she was concerned that Williams had hurt Alexander. A recording of the 911 call was played for the jury at trial.

When emergency medical responders arrived at Alexander's home around 7:00 p.m., Williams was seated outside with a manila folder in his hands and said, "[I] think[] [my] mom is dead." Williams then led them to his mother, who was lying on her back in the garage wearing only her bra and leggings and covered with a burn-marked sheet, which Williams stated he had used to cover her. Alexander was clearly deceased; her body showed signs of rigor mortis, which takes six to eight hours to set in, and she had multiple sharp-force injuries to her head and neck.[3] Blood smears between Alexander's body and her car suggested she had been dragged through the garage.

---

[3] The medical examiner who performed Alexander's autopsy testified that Alexander had an unknown number of overlapping sharp-force injuries to her head and neck, several of which would have been independently fatal, as well as a number of sharp-force injuries to other parts of her body. He explained that one of the sharp-force injuries fractured Alexander's skull, which is "unusual" and would take "considerable force."

Williams told the paramedics that he had just been released from the hospital and that his "mom was not responsive," so he tried to get her in the car, and when he could not get her in the car, he "tried to put her under it." One of the paramedics, who had experience dealing with people in mental health crises, described Williams as "very calm" and testified that Williams answered all her questions and did not seem "out of sorts in any sort of way." She also testified that she was aware at the time that Williams had been to Grady Hospital for mental health concerns but that he "wasn't answering like somebody who was, you know, out of their mind. Everything he said was straight forward. It all made sense."

Law enforcement officers located bloodstains on the stairs leading into the garage. Blue gloves, a plastic bag, and a bloody towel were found in the garage; charcoal, lighter fluid, and a sheet matching the one covering Alexander were discovered inside Alexander's car. Inside the house, a mop bucket, an open bottle of bleach, and a bloody knife with a bent blade containing Alexander's DNA were found. Also, a significant amount of blood was found in the master bedroom, indicating that Alexander had first been attacked in her bedroom. No sign of forced entry or robbery was identified. Alexander's car keys were found in Williams's pants pocket in his bedroom, and Alexander's wallet was found on Williams's bed. Williams was taken into police custody, where his clothing and shoes, most of which contained blood stains, were collected. Officers did not observe any injuries on Williams.

1. Williams first asserts that he received constitutionally ineffective assistance of counsel when his trial counsel failed to adequately explore William's mental health to evaluate whether Williams was competent to stand trial or had an insanity defense. We are not persuaded.

To prevail on this claim, Williams must show both that counsel's performance was professionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 US 668, 687 (1984). To establish deficiency, Williams must demonstrate that counsel "performed his duties in an objectively unreasonable way, considering all the circumstances and in the light of prevailing professional norms." *Evans v. State*, 315 Ga. 607, 611 (2023) Because "the law recognizes a strong presumption that counsel performed reasonably," Williams must show that "no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." Id. (cleaned up). To satisfy the prejudice prong, Williams must show that, but for counsel's deficient performance, there was a "reasonable probability" that the result of the trial would have been different. *Heyward v. State*, 319 Ga. 588, 592 (2024) (punctuation omitted). If Williams fails to satisfy either prong of the *Strickland* test, we need not address the other. See *Strickland*, 466 US at 697.

At the motion for new trial hearing, trial counsel, who represented Williams from the time of his arrest through trial four years later, testified that he knew the case very well and had a masters-level social worker from the DeKalb County Public Defender's Office assigned to the case as well. Trial counsel met with Williams many times and believed that they "communicated well" and that Williams was always pleasant, articulate, and a "relatively … model client."

Trial counsel was aware of Williams's involuntary commitment from the beginning and received a copy of Williams's medical records from Grady Hospital. He confirmed that he never requested a court-ordered mental evaluation or filed a motion for mental evaluation. However, he clarified that Williams under-

5

stood the nature of the charges and proceedings and that Williams was "very helpful in articulating what he believed our defense should be." Specifically, he explained that,

> as to competency, there was never really a concern about Mr. Williams'[s] competency. Given the allegations in which the case came in, there was a clear concern as to whether Mr. Williams was insane at the time of the incident. So we got the medical records and somewhere along the way, probably about 2020, 2021, I did ask a psychiatrist to go see him. Dr. Norman, who … generally, at the time was my go to on these heavy cases, on these heavy hitters, mental health cases.

Following the evaluation, trial counsel spoke with Dr. Norman directly to avoid "a paper trail." Counsel explained that Dr. Norman "did a cursory look for competency, [but] that wasn't really an issue." Instead, the issue was whether Williams "was insane at the time of the incident."[4] Trial counsel explained that "Dr. Norman's efforts were fruitless" because Williams refused to acknowledge that he had committed the act and would not endorse the use of a mental health defense. Both trial counsel and Dr. Norman did their "best to maybe have Mr. Williams recognize that maybe [pursuing a mental health defense] would be the best course of action," but Williams refused, so counsel respected his wishes and pursued "a more traditional defense."

---

[4] See, e.g., *Weston v. State*, 321 Ga. 554, 558 (2025) (explaining the difference between competency, the "mental capacity to be placed on trial," and an insanity defense, by which a defendant may assert he "did not have mental capacity to distinguish between right and wrong" at the time the crime was committed (punctuation omitted)).

Trial counsel ultimately decided not to pursue further competency inquiries or evaluations due to Williams's refusal to admit to the killing or to accept his recommendation to pursue a mental health defense. Trial counsel confirmed that Williams remained on his medication while incarcerated and that he never had any concern about Williams's behavior at trial and never believed that Williams was no longer competent. At the motion for new trial hearing, Williams did not call any experts to opine that he would have been found incompetent at the time of trial or to support an insanity defense.

As for the claim that counsel failed to adequately explore William's competency, we have explained that "[t]he threshold for competency is easily met in most cases." *Adams v. State*, 323 Ga. 279, 283 (2026) (punctuation omitted). The question is "whether, at the time of trial, the defendant was capable of understanding the nature and object of the proceedings, comprehends his own condition in reference to those proceedings, and is able to assist his counsel in providing a proper defense." Id. (punctuation omitted).

Here, trial counsel unequivocally testified that he was not concerned as to Williams's competency based on counsel's observations and interactions with Williams, along with consultations with a social worker and a mental health professional. Williams, who was receiving medication for his schizophrenia while incarcerated pending trial, appeared to understand the nature of the charges against him and the proceedings and meaningfully participated in his defense. In addition, trial counsel obtained Williams's medical records from Grady Hospital, discussed his client's mental health with a social worker, and enlisted a psychiatrist to meet with Williams and discuss the case with him. Given this record, Williams has not shown that his counsel's decision to

refrain from further exploring Williams's competency fell outside the wide range of reasonably effective assistance. See *Sullivan v. State*, 308 Ga. 508, 514 (2020) ("Given this record, even if other attorneys might have explored the mental issue further, we cannot conclude that the investigation by and tactical judgment of [a]ppellant's attorney was outside the wide range of reasonably effective assistance." (cleaned up)).

With respect to Williams's criminal responsibility, trial counsel testified that he asked Dr. Norman to evaluate Williams to determine whether to pursue an insanity defense and that counsel and Dr. Norman recommended to Williams that he assert a mental health defense. However, Williams insisted that he did not commit the crimes and refused to explore an insanity defense, so counsel elected instead to pursue a defense that the State had only circumstantial evidence of Williams's guilt and that the police had failed to adequately investigate other suspects. The trial court was authorized to credit this testimony in denying Williams's motion for new trial. See *Taylor v. State*, 315 Ga. 630, 648 (2023) ("Even to the extent there was conflicting evidence in the record about [whether counsel considered the psychologist's reports], the trial court was authorized to credit trial counsel's testimony.").

We conclude that where Williams appeared competent to stand trial, continued to assert his innocence, and declined to assert an insanity defense after being advised by counsel and a psychiatrist to pursue the defense, trial counsel was not deficient for abiding by Williams's decision on how to defend the case. See *Riley v. State*, 321 Ga. 112, 123–24 (2025) ("[A]utonomy to decide that the objective of the defense is to assert innocence is reserved for the client." (cleaned up)); *Smith v. State*, 306 Ga. 556, 558

(2019) (counsel did not perform deficiently when she made a strategic decision not to pursue a mental health defense because defendant maintained that he did not commit the murder). Accordingly, this enumeration of error fails.

2. Williams also asserts that the trial court erred by failing to sua sponte inquire into Williams's competency to stand trial once evidence of Williams's mental health history became apparent as part of the trial evidence. We disagree.

"Every person is presumed to be of sound mind and discretion but the presumption may be rebutted." OCGA § 16-2-3. In reviewing a claim that the trial court should have sua sponte conducted a competency hearing, appellate courts should "consider evidence of the defendant's irrational behavior or demeanor and any prior medical opinion regarding the defendant's competence to stand trial." *Leanos v. State*, 303 Ga. 666, 670 (2018).

> The salient question is whether the trial court received information which, objectively considered, should reasonably have raised a doubt about the defendant's competency and alerted the trial court to the possibility that the defendant could neither understand the proceedings, appreciate their significance, nor rationally aid his attorney in his defense.

*Lytle v. State*, 290 Ga. 177, 179 (2011).

Here, other than a single, short outburst during the prosecutor's opening statement,[5] there is nothing in the record to suggest that the trial court should have been alerted to the possibility

---

[5] When the prosecutor noted during her opening statement that police found Alexander's keys in Williams's pants pocket, Williams interjected, "It

that Williams did not understand the proceedings or could not aid his attorney in his defense. When the trial court inquired into whether Williams wanted to testify on two separate occasions, Williams answered all questions appropriately.[6] And on appeal, the record contains no prior medical opinion indicating that Williams was not competent to stand trial. Rather, all evidence is to the contrary. Under such circumstances, the trial court did not err by failing to hold a competency hearing sua sponte. See *Palmer v. State*, 303 Ga. 810, 813 (2018) ("A trial court has the sua sponte duty to inquire into a defendant's competency only when information becomes known to it, prior to or at the time of the trial, sufficient to raise a bona fide doubt regarding the defendant's competence." (cleaned up)); *Norris v. State*, 250 Ga. 38, 42–43 (1982) (rejecting appellant's claim that the trial court erred in failing to halt the trial and order a hearing as to her competency and explaining that testimony revealing a history of mental illness does not necessarily raise any doubts as to a defendant's competency at the time of trial).

*Judgment affirmed. All the Justices concur, except Warren, P. J., not participating.*

---

was a push start, it was no keys, she lying." Other than this one fleeting remark, nothing in the record suggests that Williams otherwise acted inappropriately during the trial.

[6] Williams ultimately elected not to testify.