NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: February 21, 2023

S22A1003.  TAYLOR v. THE STATE.

WARREN, Justice.

After a jury trial in December 2013, Jeremy Gene Taylor was convicted of the malice murder of Eric Bolar and the aggravated battery of Seaborn Roberts.[1]  Taylor raises five claims of error on appeal: that (1) the trial court abused its discretion by excluding evidence about Taylor's mental health; (2) the trial court erred by sentencing Taylor based on an inference that Taylor did not accept

---

[1] The crimes occurred on August 3, 2011.  On August 23, 2011, a Richmond County grand jury indicted Taylor on three counts: malice murder, felony murder, and aggravated battery.  After a jury trial from December 16 to 18, 2013, Taylor was found guilty on all counts.  On December 18, 2013, Taylor was sentenced to life in prison without the possibility of parole for malice murder and 20 years to be served consecutively for aggravated battery.  The felony-murder count was vacated by operation of law.  Taylor filed a timely motion for new trial on December 27, 2013, which he amended on November 24, 2020.  On January 26, 2022, the trial court denied Taylor's motion for new trial, as amended.  Taylor timely filed a notice of appeal on February 7, 2022.  The case was docketed in this Court to the August 2022 term and submitted for a decision on the briefs.

responsibility or feel remorse for his crimes because he did not plead guilty; (3) the trial court abused its discretion by denying Taylor's motion for a mistrial after a defense witness opined on the legal definition of aggravated battery; (4) Taylor received ineffective assistance of counsel because his lawyer did not investigate and present an insanity defense; and (5) Taylor received ineffective assistance of counsel because his lawyer failed to introduce mitigation evidence based on Taylor's mental health.

We conclude that the trial court did not plainly err by excluding evidence about Taylor's mental health because Taylor affirmatively waived the argument he now raises on appeal about mental health evidence being excluded at trial, and that the trial court did not abuse its discretion by denying Taylor's motion for a mistrial because the witness's testimony was based on personal knowledge and because lay witnesses are allowed to testify about an "ultimate issue" in a case. With respect to Taylor's claims of ineffective assistance of counsel, we conclude that trial counsel's investigation into Taylor's mental health and his decision not to raise an insanity

2

defense were not constitutionally deficient; that aspects of counsel's mitigation strategy were not constitutionally deficient; and that certain other aspects of trial counsel's mitigation strategy did not prejudice Taylor. Finally, we conclude that Taylor has not met his burden to show that the trial court penalized him for exercising his right to trial. We therefore affirm Taylor's convictions and sentences.

1. (a) The evidence presented at trial showed the following. On August 3, 2011, Taylor was living at the Hale Foundation, a "sober living community for men," and was in his first 30 days at the Foundation—a period of time when residents have most of their days scheduled for them.

That morning, Roberts and Eric Fairfax—who had been living at the Foundation longer than 30 days—were sitting behind a house in the Foundation parking lot. Roberts and Fairfax noticed that Taylor was walking around the lot instead of attending a required meeting. Roberts, who knew Taylor before their time at the Foundation, asked Taylor why he was not in a meeting. According

to Fairfax, Taylor's response was something to the effect of he "didn't feel like being there, didn't want to be there[,] and didn't need it." Taylor then approached Roberts and Fairfax. Although Roberts and Fairfax provided conflicting testimony about whether Roberts asked another question or said nothing else, they both stated that once Taylor reached Roberts and Fairfax, Taylor punched Roberts in the face once, knocking him unconscious. Fairfax testified that Taylor then "backed away for a second." Fairfax had "never seen anybody get hit that hard [his] entire life;" "the first hit . . . was so hard and so fast that [Fairfax] questioned whether it had actually happened." Taylor "hit [Roberts] four more times."

Fairfax intervened after Taylor hit Roberts for a fifth time. Fairfax asked Taylor to stop hitting Roberts and to not hit him. Taylor responded, "[Fairfax], I'm not going to hit you," and then, according to Fairfax, "seemed calm." Roberts and Fairfax testified that neither had any issues with Taylor leading up to the attack.

Fairfax called the police and Deputy Chris Hill responded to the scene. Roberts and Fairfax later testified that they did not speak

4

to the police that day, but Deputy Hill testified that he spoke with Roberts and that once he arrived, someone—he "believe[d] it was [Roberts]"—told him that Taylor "punched [Roberts] in the face for no reason." Deputy Hill, who saw that Roberts had a scratch on his forehead that had been bleeding, did not "speak to any medical personnel at the scene," so he was "not aware of the full extent of [Roberts's] injuries."

Deputy Hill then "turn[ed his] attention" to Taylor. While still at the Foundation, Taylor admitted to Deputy Hill that he hit Roberts. When Deputy Hill asked Taylor why, Taylor responded that he did it "because he felt like it." Taylor also told Deputy Hill that he drank alcohol the night before but that he had not consumed alcohol or drugs that day. Deputy Hill later testified that Taylor seemed "in control of his faculties" and that he did not smell alcohol on Taylor. When Deputy Hill transported Taylor to jail, Taylor did not "give [Deputy Hill] any trouble" or "appear to be agitated . . . , angry or upset[.]"

Ponyetta Odums, an employee in the Richmond County Sheriff's department, filled out a medical intake form for Taylor while booking him at the jail. Odums later testified that Taylor did not appear to be angry or intoxicated, but that Taylor told her that he had been drinking at some point recently.

Odums booked Taylor on a disorderly-conduct charge.[2] Taylor was placed in a holding cell with five other people, including Earl Bolar, a homeless man who had been charged with criminal trespassing. Odums also booked Bolar, whom she described as appearing "very jolly." She further testified that Bolar was "just going to go asleep" once he got in the holding cell and that "[h]e went inside and laid down."

After Taylor and Bolar were in the cell together for some time, jail employee Maria Hurlburt let one of the prisoners out of the holding cell to make a phone call and then escorted him back to the

---

[2] The State's charging decision was made after Deputy Hill saw only a "small mark" on Roberts's head. After the State learned of "the extent of [Roberts's] facial fractures and surgery he would need," it upgraded Taylor's charge to aggravated battery.

cell. Around 15 to 20 minutes later, Hurlburt and Odums were walking past that holding cell when they looked inside and saw Bolar on the floor. He was "fighting to catch his breath," with blood covering his nose and mouth. He could not speak and was "jerking his head" with "blood just running out" and had "defecated on himself."

When Odums asked the inmates who attacked Bolar, Taylor responded, "I did it." When asked why, he responded, "because I felt like it." Bolar was taken to the hospital and placed on life support. He died two weeks later.

Taylor was ultimately charged with malice murder and felony murder for attacking and killing Bolar and aggravated battery for attacking Roberts.

(b) Before trial, Taylor's pre-trial counsel considered raising an insanity defense on behalf of Taylor. To that end, pre-trial counsel sought and obtained two court-ordered evaluations in which a psychologist offered her opinion on Taylor's competency to stand trial and his criminal responsibility at the time of the alleged crimes.

The psychologist's first evaluation (and resulting report) focused on Taylor's competency to stand trial because, as the report reflects, Taylor initially "declined to have his mental state at the time of the alleged offenses assessed." But, at Taylor's request, the psychologist later completed a second evaluation and report addressing Taylor's criminal responsibility. As explained more below in Division 5, the resulting reports recounted Taylor's past struggles with substance abuse and mental health, but ultimately concluded that Taylor was competent to stand trial and was not insane when he allegedly attacked Roberts and Bolar. The second report also contained Taylor's account of how he attacked Bolar after his cellmates made "racist comments" and left Taylor with the impression that "they were all going to jump" him. Taylor's trial counsel decided against asserting an insanity defense, and trial counsel did not seek to admit the reports into evidence.

Even so, Taylor's trial counsel mentioned Taylor's mental health several times outside the presence of the jury. For example, the transcript shows that trial counsel remarked how "the

8

evaluations" stated that Taylor might have "delusional thinking . . . induced by probably substance abuse" but it did not rise "to the level of an insanity defense." Later, when Taylor asked during trial why his mental health was not being discussed before the jury, trial counsel remarked that he had "not seen anything" indicating that Taylor had "a defense based on mental health." Likewise, the trial court commented that a diagnosis such as bipolar disorder or depression was "not equivalent or equal to" the defense of "not guilty by reason of insanity and/or guilty but mentally ill." The trial court also expressed its understanding that Taylor had undergone "forensic . . . or mental health evaluations . . . which did not support" raising a mental health defense. To that end, the trial court noted that it wanted to be "clear for the record" that Taylor's mental health had "been investigated by [his] attorney." Taylor's trial counsel responded that "[t]he most the evaluation tells us is that Mr. Taylor was probably operating from a paranoid perspective and that would have been induced by his substance abuse" when he allegedly

committed the crimes, to which the court responded that "voluntary intoxication of whatever sort is not a defense."

(c)     Before trial, the State offered Taylor a plea bargain in which Taylor would be sentenced to life with the possibility of parole for Bolar's murder and a concurrent sentence of an unknown time for committing aggravated battery against Roberts.  Taylor did not accept that offer and elected to go to trial instead.  At trial, the four inmates who had been in the holding cell with Taylor and Bolar testified about the attack on Bolar.  They each testified that when Taylor was placed in the cell, Bolar was there and already sleeping.  In one inmate's words, Taylor walked up to Bolar sometime later and "just started beating" him and then "kicking . . . [him] in the face."  Each of the four inmates testified that Bolar was sleeping when Taylor attacked him.  Three inmates testified that no one in the cell talked to Taylor and that Taylor did not talk to any of them before the attack.  The fourth testified that he never spoke to Taylor and that Taylor and Bolar never spoke to each other.  All four testified that Taylor attacked Bolar for no apparent reason.  The

10

attack was captured by a surveillance camera, and a video recording of it was played for the jury.

The medical examiner who performed Bolar's autopsy, Dr. Daniel Brown, determined that Bolar's cause of death was homicide from blunt-force trauma. Taylor did not present any witnesses. His trial counsel asked for and obtained jury instructions on the lesser-included offenses of voluntary and involuntary manslaughter on the malice and felony-murder charges and battery on the aggravated battery charge. Taylor was found guilty of all counts: malice murder, felony murder, and aggravated battery.

(d) Taylor's mother, father, and pastor spoke briefly at sentencing. So did Bolar's mother, sister, and daughter. Taylor also spoke at sentencing, saying: "I just want to say I'm sorry. But I also want to say I'm sorry for taking an innocent man's life." The trial court said that it was "clear from the evidence" that the crimes Taylor was convicted of resulted from Taylor's history of substance abuse, and that the court was "convinced that had there not been substance abuse involved in this case," the crimes Taylor was

11

convicted of never would have occurred. It continued: "Mr. Taylor, you did not accept responsibility for your actions. The State prior to trial in this case offered you an opportunity to accept responsibility, and offered you a sentence of life with the possibility of parole." After Taylor briefly responded, the trial court said, "[y]ou declined to accept that and you declined to accept or admit any responsibility for this action."

Trial counsel reminded the court that Taylor had undergone two mental health evaluations and that Taylor experienced "paranoid thinking." Trial counsel asserted that Taylor "honestly believed" that there was a "threat" in the cell with him and that Taylor "had to defend himself" when he killed Bolar. Trial counsel then asked that the court not "punish" Taylor "for exercising his right to trial," to which the court responded: "the sentence is not intended to punish you for exercising your right to trial. It does reflect the fact that you did not accept any responsibility or show any remorse for your actions in causing the death of an individual."

12

Taylor responded that he had "accepted responsibility." He said that he told his "attorney several times that [he] would accept [a sentence for] manslaughter because that is what [he] felt like" he committed; he "did not know that [his] hands would cause that kind of damage." He said he was "sorry for what [he had] done," and that he "accepted[ed] responsibility." The trial court said that it "underst[oo]d," but that the facts necessary to support manslaughter "were not present in this case at all." Taylor did not proffer a mental-health expert at sentencing. The court then sentenced Taylor to life in prison without parole for Bolar's murder and 20 years consecutive for aggravated battery. The reason the court gave for its sentence was that Taylor failed to "accept any responsibility or show any remorse" for his actions.

2.    Taylor contends that the trial court abused its discretion by granting the State's motion to exclude from evidence portions of the medical intake form Taylor filled out at booking that pertained to his mental health. On appeal, Taylor argues that portions of the medical intake form were admissible as lay evidence of a "mental

13

health defense." But Taylor affirmatively waived any "mental health defense" at trial, so this enumeration fails.

(a) At trial, Taylor sought to introduce portions of the medical intake form that he filled out while being booked in jail. The form included 27 yes-or-no questions, and Taylor wanted to introduce his answers to questions pertaining to his mental health history. In particular, he had provided affirmative responses to question 11, which asked whether he had "any Mental Health problems," and question 16, which asked whether he had "ever tried to hurt or kill" himself.

The prosecutor made an oral motion in limine to prevent the answers from being admitted, contending that all of Taylor's answers from the form should be excluded as inadmissible hearsay and that, hearsay aside, Taylor's answers suggesting that he "may have had mental health problems" should be excluded as irrelevant and prejudicial because Taylor did not file a notice of asserting a mental health defense. The trial court explained that it "d[id]n't think" that the mental health questions "should come in to

14

evidence." Taylor's trial counsel responded that "[t]his is not a given case where we're raising a mental health defense of any kind," but contended the medical intake form should be admitted to help the jury understand Taylor's "state of mind at the time he was arrested and placed" in the holding cell. The trial court then granted the motion to exclude and ruled that it would not admit into evidence Taylor's answers to any of the questions on the intake form that related to Taylor's mental health.

(b) Taylor has not preserved this enumeration of error for ordinary appellate review. That is because Taylor contends on appeal that the trial court should have admitted the answers to the mental health questions on his medical intake form on the theory that they were lay evidence that he "heard" voices that were in reality "coming from his head," thus supporting a "mental health defense" that would have enabled the jury to "choose a lesser included charge on the verdict form." But at trial, Taylor did not advance that theory in seeking to admit those responses; to the

15

contrary, he sought their admission only to show his state of mind when "he was arrested and placed into th[e] holding cell."

Nonetheless, plain-error review applies when, on appeal, a defendant argues that evidence was admissible for a purpose other than the one for which he sought to admit the evidence at trial, as Taylor does here. See *Williams v. State*, 302 Ga. 147, 150-151 (805 SE2d 873) (2017) (applying plain-error review when on appeal the defendant argued that the court should have admitted a toxicologist's testimony about "drugs found in [the victim's] blood" in support of the defense theory that the drugs made the victim more likely to die by "asphyxiation by choking," when at trial the defendant argued only that the drugs "would have made [the victim] both 'clumsy' and 'drowsy' and 'explosive, hyperactive'").

The plain-error standard has four prongs.

First, there must be an error or defect—some sort of "[d]eviation from a legal rule"—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary

16

case means he must demonstrate that it "affected the outcome of the trial court proceedings." Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error— discretion which ought to be exercised only if the error "'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"

*Gates v. State*, 298 Ga. 324, 327 (781 SE2d 772) (2016) (quoting *State v. Kelly*, 290 Ga. 29, 33 (718 SE2d 232) (2011)).

Here, Taylor does not satisfy even the first prong of plain-error review because he affirmatively waived using the medical intake form for the purpose of supporting of a "mental health defense." To that end, the record shows that while attempting to admit the medical intake form into evidence, Taylor's trial counsel asserted that Taylor was not "raising a mental health defense of any kind," affirmatively waiving use of the medical intake form for that purpose. See *Dukes v. State*, 311 Ga. 561, 569 (2021) (858 SE2d 510) (holding that the defendant affirmatively waived the argument that a witness should have been permitted to further testify when, in response to the State's objection that the defendant had not laid a proper foundation, the defendant said, "That's all I'm going to ask

17

him" and that the witness was "not qualified" to continue testifying); *Davis v. State*, 311 Ga. 225, 230-231 (857 SE2d 207) (2021) (holding that the defendant affirmatively waived the argument that a witness was not "unavailable" under the hearsay rules when the defendant told the judge that the State's argument for why the witness was "unavailable" was "right" and asked that all of the witness's testimony come in, not only the parts that helped the State). Because Taylor has not shown that the trial court plainly erred, his claim fails.

3. Taylor contends that the trial court erred by using his decision to forgo a plea deal as a consideration during sentencing. Taylor does not rely on a "presumption of vindictiveness" in advancing his claim, and instead points to what he deems the trial court's "improper consideration of the rejection of a plea deal." Because Taylor has failed to meet his burden in showing that the trial court sentenced him with an impermissible motive such that it penalized Taylor for exercising his constitutional right to a trial, we affirm.

18

(a)    As noted above, the State offered Taylor a plea deal before trial.  It offered Taylor a sentence of life with the possibility of parole for Bolar's murder (as opposed to the only other sentence available here for a conviction of malice murder, life without parole) and a concurrent sentence of an unknown time (as opposed to up to 20 years) for committing aggravated battery against Roberts, if Taylor agreed to plead guilty to Bolar's murder and to the aggravated battery of Roberts.  Taylor did not accept that offer and instead elected to go to trial.  He was convicted on both counts.  The trial court then imposed the maximum available sentence: life without parole with 20 years in prison consecutive.

At sentencing, Taylor's pastor, his mother, and his father testified on his behalf.  Taylor then offered remarks and had the following exchange with the trial court:

> THE DEFENDANT: I just want to say I'm sorry.  But I also want to say I'm sorry for taking an innocent man's life.
>
> THE COURT: It is clear from the evidence in this case that this was a result of substance abuse of a long nature.  Mr. Taylor, you did not accept responsibility for your

19

actions. The State prior to trial in this case offered you an opportunity to accept responsibility, and offered you a sentence of life with the possibility of parole.

THE DEFENDANT: Yes, ma'am.

THE COURT: You declined to accept that and you declined to accept or admit any responsibility for this action. And you come from a good and loving family.

Taylor's counsel, after referencing Taylor's mental health and substance abuse, asked that the trial court not "punish Mr. Taylor for exercising his right to trial" and stated that Taylor "felt in his heart that he was not a murderer." The court responded that "the sentence is not intended to punish you for exercising your right to trial. It does reflect the fact that you did not accept any responsibility or show any remorse for your actions in causing the death of an individual." Taylor then asked to speak and stated:

> Judge . . . I have accepted responsibility for it. I told my attorney several times that I would accept manslaughter because that is what I felt like I have done. I did take manslaughter. Okay. But I had no intent to -- I did not understand the severity, I did not understand Mr. Roberts, and I didn't know that he was as bad as he was. I did not know that my hands would cause that kind of damage. I had no idea. And I'm sorry for what I've done. I do accept responsibility. That's all.

20

The court responded that the necessary "facts [for manslaughter] were not present in this case at all." It then sentenced Taylor.

(b) In reviewing Taylor's claim, we "presume the trial court knew and applied" the law when sentencing Taylor "'absent some indication in the record suggesting otherwise.'" *Holmes v. State*, 311 Ga. 698, 706 (859 SE2d 475) (2021) (quoting *State v. Abbott*, 309 Ga. 715, 719 (849 SE2d 105) (2020)). We also keep in mind that, although not without limits, sentencing judges generally are afforded wide discretion. See *State v. Riggs*, 301 Ga. 63, 68 (799 SE2d 770) (2017) ("[T]rial courts generally have the discretion to fashion sentences that fit the crimes for which the defendant is convicted, so long as the sentences fall within the statutory ranges."). One limitation on that discretion is the constitutional prohibition of sentences that punish defendants for exercising their constitutional rights, such as the right to trial. See *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (98 SCt 663, 54 LE2d 604) (1978) ("To punish a person because he has done what the law plainly allows

him to do is a due process violation of the most basic sort, and for an agent of the State to pursue a course of action whose objective is to penalize a person's reliance on his legal rights is 'patently unconstitutional.'") (citations and punctuation omitted); *Corbitt v. New Jersey*, 439 U.S. 212, 221-225 (99 SCt 492, 58 LE2d 466) (1978) (applying *Bordenkircher* to a statutory sentencing framework). See also *North Carolina v. Pearce*, 395 U.S. 711, 725 (89 SCt 2072, 23 LE2d 656) (1969) ("Due process of law, then, requires that vindictiveness against a defendant for having successfully attacked his first conviction must play no part in the sentence he receives after a new trial."), overruled in part by *Alabama v. Smith*, 490 U.S. 794 (109 SCt 2201, 104 LE2d 865) (1989). But see *Bordenkircher*, 434 U.S. at 363 ("[I]n the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer.").

In contending that the trial court had an impermissible motive in sentencing, Taylor does not rely on the presumption of vindictiveness established in *Pearce*, 395 U.S. at 726. He does not

cite any cases showing what burden he bears to prevail on his claim, so we presume that he must "show actual vindictiveness," see *Texas v. McCullough*, 475 U.S. 134, 138 (106 SCt 976, 89 LEd 2d 104) (1986), especially given that Taylor does not contend that any other standard applies. See also, e.g., *Alabama*, 490 U.S. at 799-800 (defendant bears the burden when alleging actual vindictiveness in resentencing). Cf. *United States v. Dvorin*, 817 F.3d 438, 454 (5th Cir. 2016) (defendant bears the burden by a preponderance of the evidence when alleging actual prosecutorial vindictiveness).

In Taylor's view, he has shown that the trial court punished him for choosing to exercise his right to trial because the proximity of the court's statement that Taylor "declined to accept" the plea with its finding that Taylor "declined to accept or admit any responsibility" necessarily implies that the court considered Taylor rejecting the plea deal in assessing whether he accepted responsibility. He contends that inference is particularly strong because the record—which shows Taylor stating three times during sentencing that he was sorry and also stating that he "accepted

23

responsibility"—contradicts the trial court's finding that Taylor "did not accept responsibility" and "did not show any remorse."

We are not so sure. Although the trial court's reference to Taylor declining the State's plea offer—particularly in such close proximity to its finding that Taylor "declined to accept or admit any responsibility"—could be viewed as implying that the trial court equated Taylor rejecting a plea (and then exercising his right to trial) with a lack of acceptance of responsibility and remorse, we cannot say that is definitively so. Indeed, at most Taylor has shown that the record is ambiguous with respect to the court's motive in sentencing Taylor. We reach that conclusion in large part because after making the potentially problematic statements referenced above, the trial court expressly stated that "the sentence [wa]s not intended to punish [Taylor] for exercising [his] right to trial," and that the sentence was based on the court's finding that Taylor "did not accept any responsibility or show any remorse." And the record could be viewed as supporting that conclusion: the trial court was authorized to evaluate Taylor's credibility and the genuineness of

24

his remorse, see *Isaacs v. State*, 259 Ga. 717, 723 (386 SE2d 316) (1989) ("'[S]incere contrition'" "is a permissible area of inquiry during sentencing."), and it was authorized to discredit Taylor's statement that he accepted responsibility for the crimes—especially given that he immediately followed one of his apologies by saying "I would accept manslaughter" (not the murder charge for which he was convicted) "because that is what I felt like I have done"—a comment that the trial court could have viewed as undermining the genuineness of any or all of Taylor's apologetic statements.

To be sure, if the trial court exercised its discretion to give Taylor the maximum available sentence because it did not, in fact, believe his multiple apologies were genuine, or because his professed acceptance of responsibility was not credible, the better course under these particular circumstances would have been for the trial court to make those findings on the record and make no suggestion— implicit or explicit, cf. *Winfrey v. State*, 304 Ga. 94, 98 (816 SE2d 613) (2018)—that the exercise of Taylor's constitutional right to trial motivated the trial court's sentence. But viewing the record as a

whole, and in light of the presumption that the trial court knew and applied the law, see *Holmes*, 311 Ga. at 706, we cannot say that Taylor has carried his burden of showing that the trial court penalized him for exercising his right to trial. We therefore affirm his sentence.

4. Taylor contends that the trial court abused its discretion in denying Taylor's motion for a mistrial after one of the State's lay witnesses provided improper testimony by testifying that "the law dictate[d]" that aggravated battery was the appropriate charge for Taylor attacking Roberts. For the reasons that follow, this claim fails.

(a) Taylor was originally charged with disorderly conduct for attacking Roberts. However, once the State was informed that Roberts's injuries were more severe than initially known, the State filed additional charges against Taylor. While examining an investigator at trial, the prosecutor asked why Taylor's charge was upgraded from disorderly conduct to aggravated battery. The investigator responded: "[A]fter meeting with the victim and

26

viewing his injuries and speaking with his doctors on the extent of his facial fractures and surgery he would need, the law dictates that that was the appropriate charge." Taylor moved for a mistrial, arguing that the answer "invade[d] the province of the jury" because it is the jury's role to determine the "appropriate charge." The trial court denied Taylor's motion. Later, in denying Taylor's motion for new trial on the same issue, the trial court ruled that the investigator's testimony was "most fairly seen as an attempt to explain his own conduct in upgrading the charge . . . rather than an opinion on the ultimate issue of whether [Taylor] committed the offense." In the alternative, the trial court ruled that the investigator's "remark was not barred even if it touched on the ultimate issue in the case" under OCGA § 24-7-704 (a).

(b) "Under Georgia's Evidence Code, a lay witness 'may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of such matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony.'" *Draughn v. State*, 311 Ga. 378, 385

(858 SE2d 8) (2021) (quoting OCGA § 24-6-602 ("Rule 602")) (holding that eyewitness testimony identifying the defendants in a surveillance video was based on personal knowledge because the witness identified the defendants based on his "recollection of the stabbing"). In addition, except for certain expert testimony, "testimony in the form of an opinion or inference otherwise admissible shall not be objectionable because it embraces an ultimate issue to be decided by the trier of fact." See OCGA § 24-7-704 ("Rule 704"). "This Court has repeatedly held . . . that the current Evidence Code . . . abolished the prohibition on lay opinion testimony concerning the ultimate issue in a case." *Fisher v. State*, 309 Ga. 814, 821 (848 SE2d 434) (2020) (cleaned up).

To the extent the trial court concluded that the investigator's testimony was proper lay testimony because it was based on personal knowledge about why Taylor's charges were upgraded, see *Draughn*, 311 Ga. at 384-385, we see no abuse of discretion in the trial court denying Taylor's motion for mistrial on that basis. And even assuming, without deciding, that the investigator's testimony

touched upon the ultimate issue in this case, see *Pyatt v. State*, 298 Ga. 742, 754 (784 SE2d 759) (2016) (assuming without deciding that a law enforcement officer's testimony touched on the ultimate issue when he testified among other things that "In my opinion and in what I consider the law[,] that is aggravated assault"), we likewise see no abuse of discretion in the trial court's denial of the motion on that basis. *Thornton v. State*, 307 Ga. 121, 127-128 (834 SE2d 814) (2019) (concluding that a lead detective's testimony that only one suspect could have committed part of the crime was lay testimony and thus not barred by Rule 704). See also *Fisher*, 309 Ga. at 820-821 (noting that Rule 704 would not have barred a lead detective's testimony about whether someone was an accomplice to the defendant's crime even if it touched upon the case's ultimate issue because that rule does not bar lay opinion testimony).

5. Taylor contends that his trial counsel provided ineffective assistance under the Sixth Amendment to the United States Constitution because trial counsel failed to investigate and make arguments related to Taylor's mental health at both the guilt and

sentencing phases of his trial. Some additional background is necessary to review Taylor's claim. To begin, because Taylor was indigent and unable to pay for expenses related to his defense, Taylor's pre-trial counsel (who did not participate at trial) filed with the trial court a petition for a court-ordered psychiatric evaluation to be performed on Taylor. Before trial, the trial court ordered a psychiatric evaluation to determine whether Taylor was (1) "mentally competent at the time" of the alleged crimes and (2) "competent to counsel with his attorney and [] competent to stand trial." The trial court also ordered that the psychiatrist's findings be memorialized in a report. Pursuant to the court order, Dr. Elizabeth Donegan, a licensed psychologist[3] employed by the Georgia Department of Behavioral Health & Developmental Disabilities, performed two evaluations and produced two reports. A March 2012 report addressed whether Taylor was competent to stand trial, and a February 2013 report addressed Taylor's mental

---

[3] On appeal, Taylor does not enumerate any error related to Dr. Donegan being a psychologist and not a psychiatrist.

state at the time of the alleged crimes against Roberts and Bolar. Dr. Donegan explained in the second report that a second evaluation was needed to evaluate Taylor's mental state when he attacked Roberts and Bolar because, during the first evaluation, "Taylor declined to have his mental state at the time of the alleged offenses assessed." Ultimately, neither the March 2012 report nor the February 2013 report were introduced into evidence at trial, but those reports are at the center of Taylor's claims of ineffective assistance of counsel and were part of the record at the motion-for-new-trial stage.

*March 2012 Report.* In the first report, Dr. Donegan determined that Taylor knew the charges he faced, knew he could go to prison if convicted, and "demonstrated awareness of the judicial process." According to Dr. Donegan, Taylor showed the ability to exercise behavior that would be "appropriate for the courtroom," and he "was able to provide relevant information in response to questions." Dr. Donegan concluded that "Taylor appeared to understand the nature and object of the proceedings, to

31

comprehend his situation in reference to the proceedings, and to have the capacity to render his attorney assistance in providing a proper defense."

*February 2013 Report.* As explained more below, Dr. Donegan concluded in her second report that when he attacked Roberts and Bolar, Taylor did not appear to be under a "delusional compulsion that overmastered his will to resist committing the offenses" or "unable (as a result of mental illness or impairment) to distinguish basic concepts of right and wrong." Before reaching this conclusion, Dr. Donegan conducted two "[c]linical forensic interview[s]" with Taylor, one in January 2012 and the other in January 2013, and examined court documents from Taylor's arrest, medical records from while Taylor was in jail, and medical records from three of Taylor's earlier hospitalizations.

Dr. Donegan noted that Taylor had a history of substance abuse and mental-health-related issues. Taylor's substance abuse mainly involved the use of alcohol, marijuana, and cocaine. His mental health history included, among other things, two

hospitalizations for harming himself and diagnoses of Polysubstance Dependence, Intermittent Explosive Disorder, Antisocial Personality Disorder, Substance-Induced Mood Disorder, Substance-Induced Psychosis, and Substance-Induced Psychotic Disorder.

The report recounted Taylor's accounts of the beatings of Roberts and Bolar. Taylor said that he was doing cocaine and drinking with Roberts the morning of the crimes, and that he had experienced "some paranoia while in the Hale House," including thinking that "everyone" there was "out to hurt" him, and that he was "kinda high, but . . . too stressed out and too spooked to be enjoying anything." He also "thought [the other inmates] were all going to jump" him. Taylor said that Bolar called him a "cracker" after the other inmates in the cell had each already "said something racist" to Taylor. Taylor told Bolar not to call him a "cracker" again. When Bolar did, Taylor "hit him and kicked him and hit him and kicked him." The report then noted that, "in clarification," Taylor said he was not sure whether the inmates were actually talking to

him or "it was voices [he] was hearing," but that he "denied experiencing hallucinations in his history." Taylor said that "he did not think that" he would have attacked Roberts and Bolar "if he had not been using [drugs] that day."

Dr. Donegan concluded:

> While Mr. Taylor appears to have some mental health treatment history; largely, it appears, in connection with substance abuse; and a tendency for interpreting people's actions and statements in a paranoid or derogatory manner was reported during that period surrounding the alleged offenses, Mr. Taylor did not express overtly delusional beliefs directly related to the alleged offenses and other available evidence for review surrounding the times of the alleged offenses did not note Mr. Taylor to have made seemingly delusional statements in regard to the alleged offenses and his behaviors or suggest he experienced delusional thinking during those times. Behaviors surrounding the alleged offenses do not appear to have resulted from a delusional compulsion that overmastered his will to resist committing the offenses. Available information from the period surrounding the alleged offenses also does not suggest Mr. Taylor experienced mental health symptoms during the time of the alleged offenses to a degree of severity that his mental capacity was so impaired that he was unable (as a result of mental illness or impairment) to distinguish basic concepts of right and wrong during those times. Mr. Taylor is though noted to have been abusing alcohol and cocaine in close proximity to the alleged offenses, the use of which, it appears reasonable

to presume, would likely have made him more prone to impulsive behavior and poor judgment and, based on his history, irritability and a paranoid perspective.

*Taylor's Motion for New Trial.* At the hearing on Taylor's motion for new trial, trial counsel testified about his trial strategy. He explained that, although he did not personally request that mental health evaluations be conducted for Taylor, a lawyer who represented Taylor before trial did so and that Dr. Donegan eventually conducted them. Trial counsel was "fairly confident" that he reviewed those evaluations around the time of Taylor's trial. After Taylor's motion-for-new-trial counsel attempted to impeach Taylor's trial counsel by asking whether trial counsel told another lawyer in 2016 that he did not read Dr. Donegan's reports[4], trial counsel testified "[t]hat would not be consistent with [his] memory" and clarified that he read Dr. Donegan's evaluations and did not raise an insanity defense because he understood them to "say that

---

[4] Taylor presented testimony from a lawyer who worked on Taylor's case after he was convicted. She testified that she ran into Taylor's trial counsel in court one day in 2016 and had "a very brief conversation" with him in which she asked whether he had been "able to read [Dr. Donegan's] evaluations"; he responded "he had not."

35

[Taylor] was competent," although he "recall[ed] some language to the effect that there was some delusional component to his thinking processes." Trial counsel explained that his strategy was requesting "lesser included offenses" for Taylor instead of pursuing an insanity defense.

On cross-examination, the prosecutor elicited testimony from Taylor's trial counsel that counsel must have considered an insanity defense for Taylor because he mentioned on the record before trial that he was *not* raising a mental health defense and that Taylor's diagnosis of substance-induced psychosis would have created problems because voluntary intoxication generally is not a defense. With respect to his representation at the sentencing phase, trial counsel testified that his decision not to call "doctors or experts during the mitigation" phase of sentencing was not a "strategic choice," and that he "probably should have" done that "in hindsight."

Taylor also called a forensic psychologist, Dr. Paganelli, to testify. Dr. Paganelli evaluated Taylor in 2020, around seven years after Taylor was convicted for attacking Roberts and Bolar. She

concluded that Taylor was having "paranoid delusions" when he attacked Roberts and Bolar "that were not directly caused by any substance or any alcohol." According to Dr. Paganelli, Taylor's mental health issues and events like a car accident, losing his job, being physically attacked in a previous job, and "split[ting] up" with his wife—and not exclusively drug use—contributed to his mental state when he attacked Roberts and Bolar. She concluded that Taylor was "very likely . . . experiencing psychotic and mood disorder symptoms alongside his alcohol and drug use in the community" but that those "were masked by his substance abuse and/or completely attributed to drugs of abuse, as many substances of abuse (specifically cocaine) can cause paranoia and other symptoms that mimic psychosis." Dr. Paganelli diagnosed Taylor with "Schizophrenia, Schizoaffective Disorder, and/or Bipolar Disorder." However, Dr. Paganelli concluded that "Taylor does not meet the criteria for a not guilty by reason of insanity plea."

The trial court denied Taylor's claims of ineffective assistance of counsel, finding that despite trial counsel's inability to remember

with certainty whether he reviewed Dr. Donegan's reports, "the record shows counsel indeed undertook such an evaluation and affirmatively concluded the evidence did not support" raising an insanity defense. For example, the trial court pointed out that "trial counsel's ability to recall the most favorable details from Dr. [Donegan's] findings indicate[s] prior consideration of these findings." The trial court also noted that "[d]espite mental health evaluations conducted both before and after trial, there has been no evidence produced to support a finding that [Taylor] lacked the mental capacity to distinguish right from wrong or that he suffered from a delusional compulsion." It also highlighted various problems Taylor would face if he had tried to introduce Dr. Donegan's report to support an insanity defense. First, the report would have highlighted the role of substance abuse in Taylor's conduct, whereas the jury otherwise heard minimal evidence about his substance abuse, thus "inject[ing] the negating dynamic of [Taylor's] chronic history of controlled substance addiction." And the report could have harmed Taylor's defense because it might have led the jury to

believe that Taylor's attack on Bolar was racially motivated. The trial court held that trial counsel's decision not to raise an insanity defense at trial was not constitutionally deficient performance under *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984). It also concluded that Taylor was not prejudiced by any alleged deficiency related to trial counsel's performance at sentencing, reasoning that "[g]iven the Court's repeated appeal to the impact of voluntary intoxication, it is unlikely any additional evidence of Defendant's mental health history would have had an impact on the Court's decision to sentence" and that trial counsel's further reference to either the pre-trial or post-trial expert reports would have been of no benefit to Taylor because both "make clear the causative dynamics of substance abuse with respect to Defendant's aberrant behaviors."

(b) To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was deficient and that the deficient performance resulted in prejudice to the defendant. *Strickland*, 466 U.S. at 687; *Wesley v. State*, 286 Ga.

355, 356 (689 SE2d 280) (2010). To satisfy the deficiency prong, a defendant must demonstrate that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013). See also *Strickland*, 466 U.S. at 687-688. To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. See id. at 694. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010).

Claims of ineffective assistance of counsel involve mixed questions of law and fact, and "a trial court's factual findings made in the course of deciding an ineffective assistance of counsel claim will be affirmed by the reviewing court unless clearly erroneous." *Green v. State*, 302 Ga. 816, 818 (809 SE2d 738) (2018) (citation and punctuation omitted). Conclusions of law based on those facts are

40

reviewed de novo. See *Bright v. State*, 292 Ga. 273, 274 (736 SE2d 380) (2013).

(c) Taylor contends that his trial counsel was ineffective for failing to investigate and raise a defense of insanity on his behalf. As part of that claim, Taylor contends that trial counsel should have read Dr. Donegan's reports, obtained Taylor's hospital and jail records, and obtained and introduced an expert report on Taylor's mental health from an "independent psychologist." Taylor further contends that his trial counsel should have raised and supported a defense of insanity by, for example, having Taylor's mother testify about Taylor's mental health and by introducing the medical intake form Taylor filled out when he was booked into jail.

"We have explained before that, generally speaking in non-capital cases, a trial counsel's 'decision to forego or curtail' further investigation of an accused's mental health, 'even when there has been a previous mental hospitalization, is reasonable when an expert has determined that the defendant is fit to stand trial or that he was sane at the time of the offense.'" *Sullivan v. State*, 308 Ga.

41

508, 513 (842 SE2d 5) (2020) (quoting *Whitus v. State*, 287 Ga. 801, 803-804 (700 SE2d 377) (2010)).  In *Sullivan*, for example, this Court held that trial counsel's "failure to procure and present to the jury expert testimony about [the defendant's] mental health and its effect on his criminal responsibility" was not constitutionally deficient when trial counsel "obtained mental evaluations" finding the defendant competent to stand trial and competent at the time of the offenses and trial counsel "consulted medical records."  Id. at 512-514.  See also *Whitus*, 287 Ga. at 803-804 (defendant failed to show that her trial counsel "unreasonably relied on [an expert's psychiatric] evaluation" and thus failed to show that trial counsel was constitutionally deficient for failing to obtain an additional evaluation when her trial counsel "testified that he believed the evaluation was fair and balanced and that he had no reason to disagree and request additional testing").

Here, Taylor has failed to show that trial counsel was deficient for failing to further investigate the possibility of an insanity defense.  To begin, the trial court concluded at the motion-for-new-

trial stage that Taylor's trial counsel *did* read and consider Dr. Donegan's reports. Even to the extent there was conflicting evidence in the record about that point, the trial court was authorized to credit trial counsel's testimony (as well as evidence such as counsel's references to Dr. Donegan's reports during trial) over the testimony of post-conviction counsel. See *Stepp-McCommons v. State*, 309 Ga. 400, 410 (845 SE2d 643) (2020) (the trial court "'resolve[s] any conflicts in the testimony'" at motion-for-new-trial hearing) (citation omitted). Thus, "this is not a case where trial counsel made no effort to investigate the potential for a defense based on mental health issues or relied exclusively upon his own lay evaluation of the mental health of his client." See *Sullivan*, 308 Ga. at 514 (cleaned up). Moreover, Taylor has not shown that it was objectively unreasonable for his trial counsel to rely on Dr. Donegan's two reports—which she drafted after examining court documents from Taylor's arrest, medical records from while Taylor was in jail, and

43

medical records from three of Taylor's earlier hospitalizations[5]—and in light of those reports, cease additional investigation into Taylor's mental health and decide against raising additional evidence that could have supported an insanity defense.  See *Whitus*, 287 Ga. at 803-805; *Sullivan*, 308 Ga. at 513-514.[6]  Thus, under the circumstances presented here, Taylor's trial counsel was not constitutionally deficient in declining to obtain or introduce evidence (such as the medical intake form) in support of an insanity defense. This enumeration therefore fails.

[5] Notably, Taylor has not shown how having trial counsel obtain records like the ones Dr. Donegan relied on would have equipped trial counsel to present different, let alone more favorable, arguments about Taylor's mental health than Dr. Donegan.

[6] To the extent Taylor also contends that his trial counsel was constitutionally deficient because he "did not request from the trial court that an *independent* psychologist examine Mr. Taylor prior to trial" (emphasis added), his unsupported contention also fails.  Indeed, Taylor has not alleged, let alone shown, that Dr. Donegan suffered from any conflict of interest or other deficiency such that she was not "independent," and we cannot say that trial counsel was constitutionally deficient on this basis.  See *Whitus*, 287 Ga. at 804.

(d) Taylor also raises a claim of ineffective assistance of counsel related to his trial counsel's performance in the sentencing phase of trial. Citing only two Court of Appeals cases in which that court concluded that the trial counsel involved in those cases did *not* provide ineffective assistance[7], Taylor contends that his "trial counsel erred in failing to seek out mitigation evidence" at sentencing. He argues that his trial counsel should have done three things: sought out and introduced expert "mental health or mitigation" evidence; brought to the court's attention evidence of Taylor's "mental illness already in the record"; and brought to the trial court's attention Taylor's statement contained in Dr. Donegan's report that he felt "like crap" for killing Bolar. Analyzing Taylor's claim under the proper *Strickland* standard, we conclude that his claims fail.

---

[7] See *Owens v. State*, 324 Ga. App. 198, 206 (749 SE2d 783) (2013) (analyzing a claim of ineffective assistance under *Strickland*'s prejudice prong); *Tyner v. State*, 313 Ga. App. 557, 565-567 (722 SE2d 177) (2012) (trial counsel was not deficient under *Strickland* for failing to present mitigation testimony about the defendant's mental health when "trial counsel was never made aware of [the defendant's] condition").

As an initial matter, we have already established that Taylor's pre-trial counsel secured two mental health evaluations of Taylor and that the psychologist who examined him provided two expert reports. And we have concluded that counsel did not perform deficiently at the trial stage when, in reliance on Dr. Donegan's reports, he declined to further investigate Taylor's mental health. See supra, Div. 5 (c). Even to the extent trial counsel testified at the motion-for-new-trial hearing that his decision not to call experts at the sentencing stage was not strategic, the standard for evaluating trial counsel's conduct is an objective one under *Strickland*; "hindsight has no place in an assessment of the performance of trial counsel, and a lawyer second-guessing his own performance with the benefit of hindsight has no significance for an ineffective assistance of counsel claim," and we cannot say that trial counsel was constitutionally deficient under the circumstances presented in this case by declining to have an additional expert evaluate and then testify about Taylor's mental health at his sentencing. *Keener v. State*, 301 Ga. 848, 850 (804 SE2d 383) (2017) (cleaned up)

46

(deemphasizing testimony from defendant's attorneys who disagreed about whether a witness was cross-examined deficiently).

To the extent that Taylor's statement that his trial counsel "did not seek out Dr. Donegan . . . to address [his] punishment" can be read as an argument that his trial counsel was deficient for failing to call Dr. Donegan to testify at his sentencing, that claim also fails. Any findings Taylor may have deemed helpful from Dr. Donegan's report were undercut by Dr. Donegan's ultimate conclusion that it was "reasonable to presume" that substance abuse contributed to Taylor attacking Bolar and Roberts and that Taylor was not "unable (as a result of mental illness of impairment) to distinguish basic concepts of right and wrong during those times." Thus, trial counsel was not objectively unreasonable for declining to have Dr. Donegan testify during Taylor's sentencing. See *Sullivan*, 308 Ga. at 512 (whether to call an expert witness to testify about a defendant's "mental health and its effect on his criminal responsibility" is a matter of trial strategy, and "to establish that a strategic decision constitutes deficient performance, a defendant must show that no

competent attorney, under similar circumstances, would have made it" (cleaned up)); *Martin v. State*, 306 Ga. 747, 751-752 (833 SE2d 122) (2019) (holding that trial counsel did not perform deficiently by not procuring an expert to evaluate and testify about the defendant's mental health because it might have led to discovery and admission of testimony trial counsel preferred to have excluded).

Next, we cannot say that trial counsel was constitutionally deficient because he did not seek and present other mitigation evidence at sentencing. To that end, Taylor has not offered any additional mitigation evidence that trial counsel reasonably could have obtained, making only a passing reference to evidence "already in the record" and a "colloquy at trial" without offering any specific example or citing any specific portion of the record or transcript. "It is not the function of this Court to cull the record for a party to find alleged errors or to form arguments on the appellant's behalf." *Neuman v. State*, 311 Ga. 83, 96 (856 SE2d 289) (2021) (citing *Henderson v. State*, 304 Ga. 733, 739 (822 SE2d 228) (2018)). Taylor

48

has failed to carry his burden of showing that counsel performed deficiently in failing to provide additional mitigating evidence.

Finally, with respect to Taylor's last claim, we assume without deciding that trial counsel's performance at sentencing was deficient when he failed to emphasize to the court the statement that Taylor felt "like crap" after attacking Bolar. We accordingly must ask whether there is a "reasonable probability" that Taylor would have received a lesser sentence had his trial counsel invoked that statement at sentencing. *Strickland*, 466 U.S. at 694.

We cannot say that there is a "reasonable probability" that Taylor would have received a lighter sentence had trial counsel invoked Taylor's statement. Id. As mentioned above, the evidence that Taylor killed Bolar was strong; the attack was recorded on a surveillance video that was played for the jury, and Taylor did not dispute that he attacked Bolar. Moreover, the trial court observed first-hand the aspects of Taylor's apology in which he said he was "sorry for taking an innocent man's life" and that he "accepted responsibility for" causing Bolar's death. We cannot say that "there

49

is a reasonable probability that" Taylor's sentence "would have been different" had his trial counsel also referenced an additional self-serving comment from Dr. Donegan's expert report—and not made in person, where the trial court could have better assessed credibility—about how Taylor said he felt, especially given that the trial court was already weighing competing evidence of Taylor's remorse or lack thereof, and that any additional apologetic comment the court credited could be viewed as cumulative. See *Lewis v. State*, 312 Ga. 537, 544 (863 SE2d 65) (2021) (holding that failure to present cumulative evidence was not prejudicial); *Wesley v. State*, 286 Ga. 355, 358 (689 SE2d 280) (2010) (same). See also *Hulett v. State*, 296 Ga. 49, 70 (766 SE2d 1) (2014) (holding that the defendant was not prejudiced by defense counsel's decision not to present mitigation evidence that was both "cumulative" of evidence presented and less "detailed and compelling").

*Judgment affirmed. All the Justices concur.*