**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: February 17, 2026

S25A1272.  FOURNIER v. THE STATE.

LAND, Justice.

Joey Travis Fournier was convicted of malice murder in relation to the strangulation death of Cynthia Lynn Berry.[1] On appeal, Fournier argues that the trial court abused its discretion by

---

[1] The crimes occurred on February 20, 2022. On April 27, 2022, a Bibb County grand jury indicted Fournier, charging him with malice murder (Count 1), felony murder (Count 2), and aggravated assault (Count 3).

At a trial from April 1 through April 4, 2024, a jury found Fournier guilty on all counts. On June 18, 2024, the trial court sentenced Fournier to serve life in prison for Count 1. Count 2 was vacated by operation of law. Although the trial court purported to merge Count 3 into Count 2 for sentencing purposes, it should have instead been merged into Count 1 because Count 2 was vacated. However, we decline to correct the error because a correction would have no impact on Fournier's sentence. See *Williams v. State*, 316 Ga. 147, 153 (2023) (where "the trial court's incorrect nomenclature did not affect [a]ppellant's sentence," "there is no sentencing error to correct").

Fournier filed a timely motion for new trial on April 5, 2024, which was later amended through new counsel on September 18, 2024. Following a hearing on November 14, 2024, the trial court denied the motion for new trial, as amended, on March 24, 2025. Fournier timely filed a notice of appeal on March 31, 2025. This case was docketed to the August 2025 term of this Court and submitted for a decision on the briefs.

admitting certain autopsy photographs and that his trial counsel rendered constitutionally ineffective assistance by failing to properly object to those photographs. For the reasons that follow, we affirm.

The evidence presented at trial showed the following. Fournier's friend, Ashton "Cody" Piscitelli, testified that he and Fournier worked together. After work on February 20, 2022, Fournier and Piscitelli stopped by a liquor store, where Fournier purchased Fireball shots. Piscitelli then dropped Fournier off at Berry's house around 7:30 p.m. before driving Fournier's truck to his home nearby.[2] At 10:51 p.m., Fournier called Piscitelli and said that he "need[ed] a ride." Piscitelli found Fournier walking near the entrance to Berry's neighborhood. As Fournier got into the truck, he pointed a gun at Piscitelli and said, "I need you to take me to the hunting club."

During the drive, Fournier told Piscitelli that he had "strangled [Berry] with his hands" "until she was cold" and left her

---

[2] Fournier and Berry were involved in a romantic relationship.

2

"on the kitchen floor." Fournier also called his brother and told him that he and Berry "got into it," Berry was dead, and "he was going out to his hunting land to commit suicide." At one point, Fournier "took the gun off of [Piscitelli] for a split second, … put it in his mouth," and said that he was going to kill himself. Fournier also threatened to kill Piscitelli. Piscitelli dropped Fournier off at the hunting land and drove away. Fournier then placed another call to his brother, again saying that "he was going to end his life." Fournier's brother later picked him up from the hunting land and brought him to his house. Fournier again told his brother that he and Berry "got into a fight …, it went bad," and Berry was dead.

As he drove home, Piscitelli called another friend of Fournier's, Matt Long, to tell him what had happened[3] and then called 911. Officers responded to Berry's house and found her deceased on the couch with a "cord" and "ligature marks" around her neck.[4] Officers

---

[3] At that time, Long saw that he had a missed call and voicemail from Fournier in which he said "goodbye" and that he had not done anything that "wasn't deserved." Fournier's voicemail was played for the jury.

[4] The "cord" around Berry's neck was determined to be a drawstring that had been removed from a nearby jacket.

recovered five empty Fireball shot bottles from the scene and noted that there were no signs of forced entry or any struggle. On February 22, 2022, Fournier was arrested.

During his custodial interview, which was played for the jury, Fournier told investigators that, on the night in question, he bought Fireball shots and went to Berry's house for dinner. While Berry was "doing shots," Fournier took a shower, and then Berry came "out of the kitchen, belligerent, drunk, and attack[ed] [him]." Fournier claimed that he did not remember anything else until Piscitelli picked him up, but he admitted that he knew "something bad" had happened and stated that "it was not intentional." He remembered telling Piscitelli that he had gotten into a fight with Berry and that he thought he had "killed her," and he remembered calling Long and leaving him a message. When shown photographs of Berry from the scene, Fournier refused to look at them and said that he was "disgusted with" himself and "regret[ted]" what happened.

Fournier testified in his own defense at trial. He claimed that his volatile romantic relationship with Berry was typified by Berry

4

being drunk and acting "pretty violent[ly]" toward him. He also said that Berry's hostility toward his teenage daughter caused significant conflict in the relationship. Fournier's testimony was mostly consistent with his initial interview statements to law enforcement. He added that, on the night of Berry's death, Berry said she "was going to torment [his] daughter until [his daughter] committed suicide." In response, he "saw red" and became "very angry," but he again claimed not to remember what happened before Piscitelli picked him up.[5] When pressed on cross-examination, however, Fournier acknowledged that he "was the only one at the house," so he "probably did" strangle Berry.

1. Fournier argues that the trial court abused its discretion by admitting "several autopsy photos depicting the different angles of the body and additional post-incision interior parts of the neck." We are not persuaded.

On the third morning of trial, prior to the jury entering the courtroom, the State asked for a brief hearing on the admissibility

---

[5] Fournier denied pointing a gun at Piscitelli during the drive.

5

of two autopsy photographs – State's Exhibit 24 and 25 – that depicted internal injuries to Berry's neck. The State contended that the photographs were necessary to support the medical examiner's conclusions "relating to injury and cause of death." Fournier's counsel argued that there was no need to publish the post-incision photographs because the defense was "not questioning the manner of death."

The State then called the medical examiner, who testified that Berry's "cause of death was asphyxia due to ligature strangulation. And the manner of death was homicide." She explained that an examination of the injuries on Berry's "internal neck structures" was necessary to reach these conclusions. She also testified that the disputed photographs showed "different" injuries – State's Exhibit 24 depicted injuries to Berry's neck muscles, and State's Exhibit 25 showed fractures to Berry's hyoid bone and hemorrhaging around it – and would both be "helpful" for her to explain to the jury the existence of Berry's fatal injuries. The trial court ruled that the two photographs were admissible because they were "relevant to show

6

the nature and location of [Berry]'s wounds" and "necessary for the Medical Examiner to explain [Berry]'s injuries, even though some of the photographs are graphic."

Fournier's counsel then argued that some of the other anticipated autopsy photographs – State's Exhibits 9, 10, 18, 19, 22 and 23 – were cumulative because they "depict[ed] the same exact photo from … different angles." The medical examiner disagreed with that characterization, testified that the photographs "document exactly how the body was when we received it," and agreed with the prosecutor's statements that the photos provided "reference point[s]" for the body, and helped "orient the jury as to the location of injures." She also agreed that each photograph helped to support her conclusions and testimony relating to Berry's cause and manner of death. The court ruled that the objected-to photographs would be allowed into evidence.

The jury returned to the courtroom, and the State called the medical examiner as a witness. She first testified generally about the "ligature marks" on the exterior of Berry's neck, the internal

7

hemorrhaging on her neck muscles, and the multiple fractures to her hyoid bone, all of which suggested that "whatever implement was used was from behind" and that "a lot of constant pressure" was applied. At that point, the State tendered, and the court admitted, State's Exhibits 9, 10, 18, 19, 22, 23, 24 and 25 while noting Fournier's objections. The medical examiner then used the autopsy photographs to explain her examination to the jury and to support her conclusions about the cause and manner of Berry's death.

In its order denying Fournier's motion for new trial, the court held that the photographs "were relevant to show the nature and location of … Berry's injuries and to corroborate the State[]'s evidence of the circumstances of the killing" and "were not needlessly cumulative of other evidence." The court also noted that the probative value of the evidence "was not substantially outweighed by the risk of the cumulative presentation of evidence or by the danger of unfair prejudice to the defense."

On appeal, Fournier argues that, because he stipulated to Berry's cause of death and did not question the medical examiner's

findings, the photographs were irrelevant and that the "shocking nature of the photographs [was] highly prejudicial to the jury."[6] See *Venturino v. State*¸ 306 Ga. 391, 395–96 (2019) (explaining that the admissibility of autopsy photographs depends on their relevance and whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice).

In general, the admissibility of autopsy photographs is governed by OCGA §§ 24-4-401 ("Rule 401"), 24-4-402 ("Rule 402"), and 24-4-403 ("Rule 403"). See *White v. State*, 319 Ga. 367, 375 (2024).[7] We have explained that "[a]utopsy photographs may be relevant and probative to show the nature and location of a victim's injuries, even if the cause of death is not disputed." *Allen v. State*,

---

[6] Fournier also argues that this admissibility issue "was preserved by objection during trial." The State agrees, as do we, that the issue was preserved for ordinary appellate review.

[7] Under Rule 401, an autopsy photograph is relevant evidence if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant autopsy photographs are generally admissible as evidence, see Rule 402, but such photographs "may be excluded if [their] probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Rule 403.

307 Ga. 707, 710 (2020). And "excluding relevant evidence under Rule 403 is an extraordinary remedy that should be used only sparingly." Id. (citation and punctuation omitted). "We review a trial court's evidentiary rulings under an abuse of discretion standard of review." *White*, 319 Ga. at 376 (citation and punctuation omitted).

Here, the internal autopsy photographs were relevant and probative to support the medical examiner's testimony explaining the circumstances surrounding Berry's death. They "visually depicted some of the considerations the medical examiner made" – such as the injuries to Berry's neck muscles, the fractures to her hyoid bone, and the hemorrhaging around it – when determining Berry's cause of death. See *Burks v. State*, 322 Ga. 865, 873–74 (2025) (finding that "post-incision photographs were relevant to illustrate [the medical examiner]'s testimony about [the victim]'s cause of death" because they showed the extent of injuries that were "not visible pre-incision" and they "corroborated the State's evidence of the circumstances of the killing" (citation and punctuation omitted)). The photographs also showed the existence of injuries

that were consistent with sustained pressure having been exerted on Berry's neck, as explained by the medical examiner, which could be considered by the jury when making a determination of malice. The photographs therefore allowed the medical examiner to illustrate the nature of Berry's internal injuries and corroborated the State's evidence regarding the circumstances of Berry's death. See *Burks*, 322 Ga. at 874; *Salvesen v. State*, 317 Ga. 314, 317–18 (2023); *Allen*, 307 Ga. at 710.

Fournier contends that the photographs were highly prejudicial due to their "shocking nature." But "the mere fact that the photographs were gruesome does not, as a general matter, render them inadmissible under Rule 403." *Salvesen*, 317 Ga. at 317. See also *Plez v. State*, 300 Ga. 505, 508 (2017) ("[P]hotographic evidence that fairly and accurately depicts a body or crime scene and is offered for a relevant purpose is not generally inadmissible under Rule 403 merely because it is gruesome."). And there was nothing particularly unfair about the admission of these photographs. See *Burks*, 322 Ga. at 874 ("[A]lthough the photographs may have been

11

graphic, we cannot say that the trial court abused its discretion in concluding that their probative value was not substantially outweighed by the danger of unfair prejudice." (citation and punctuation omitted)).

Fournier argues that his proposed stipulation to the cause of death negated the photographs' relevance. We reject this argument. First, while Fournier's counsel stated to the trial court that the defense was not contesting the manner of Berry's death, there is no indication in the record that the State accepted any offer by the defense to stipulate to the cause of death or ever agreed that its right to prove its case as it deemed best was somehow limited by the proposed stipulation. As a result, the State was permitted to prove the cause of death in any permissible manner that it chose. See *Old Chief v. United States*, 519 US 172, 186–89 (1997) (agreeing, as a general matter, that "the prosecution is entitled to prove its case by evidence of its own choice" and that "a criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it"). At best, Fournier's

purported stipulation was merely an offer to stipulate that was not accepted by the State. Second, while we recognize that the defense's offer to stipulate to the cause of death may have diminished the probative value of the evidence, it did not negate it. See *Hood v. State*, 299 Ga. 95, 103 (2016) ("A rejected offer to stipulate to an issue does not render evidence on that issue irrelevant, but it must be considered under Rule 403, because the availability of the stipulation diminishes the probative value."). Under the circumstances present here, including Fournier's denial of the material allegations of the indictment through his plea of not guilty, the State's burden to prove those allegations, Fournier's claimed lack of memory concerning the circumstances surrounding Berry's death, and the usefulness of the photographs to the medical examiner during her explanation of the injuries that caused Berry's death, we conclude that the trial court did not abuse its discretion when deciding that the probative value of the evidence (even though diminished by Fournier's offer to stipulate) was not substantially outweighed by unfair prejudice. See *Salvesen*, 317 Ga. at 318–19.

13

Accordingly, this claim of error fails.

2. Fournier further argues that his trial counsel rendered constitutionally ineffective assistance because she "did not argue specifically to have the post-incision autopsy photos suppressed from evidence." And "[t]o the extent that the issue was not preserved for the record," he contends that trial counsel was ineffective. Because we conclude that Fournier's trial counsel properly objected to the photographs during the evidentiary hearing, Fournier cannot show deficiency, and this claim fails.

For Fournier to prevail on his ineffective assistance claim, he must show that his trial counsel performed deficiently and that the deficiency prejudiced him. See *Strickland v. Washington*, 466 US 668, 687 (1984). To show deficiency, Fournier must establish that his trial counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Taylor v. State*, 315 Ga. 630, 647 (2023) (citation and punctuation omitted). "Even when a defendant has proved that his counsel's performance was deficient, he also must

14

prove resulting prejudice by showing a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Evans v. State*, 315 Ga. 607, 611 (2023) (citation and punctuation omitted). "Moreover, there is no reason for a court deciding an ineffective assistance claim ... to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. (citation and punctuation omitted).

Under the current Evidence Code, "[o]nce the court makes a definitive ruling on the record admitting or excluding any evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve such claim of error for appeal." OCGA § 24-1-103(a). During the evidentiary hearing, Fournier's trial counsel objected to the admission of the contested autopsy photographs on both relevance and cumulative grounds and argued to exclude them. But the trial court ruled that they were admissible and noted trial counsel's objections when he admitted them at trial. Because Fournier's trial counsel objected to the evidence and the court overruled her objections, Fournier "fails to show any deficiency in

15

this respect." *Salvesen*, 317 Ga. at 321 (concluding that, where counsel "object[ed] to the admission of the photographs at issue and obtained a ruling with respect to all of them," trial counsel was not deficient). To the extent Fournier argues that his trial counsel should have renewed his objection when the photographs were later offered into evidence, this claim also fails. See *Gaston v. State*, 307 Ga. 634, 640–41 (2020) (trial counsel was not deficient for failing to renew his objection to the admissibility of text message evidence after the trial court had overruled counsel's prior objection to the texts); *Anthony v. State*, 298 Ga. 827, 831–32 (2016) (counsel did not need to object to the admission of other-act evidence to preserve the issue on appeal because the trial court had ruled them admissible following a pre-trial hearing). Fournier's claim of ineffective assistance of counsel therefore fails.

*Judgment affirmed. All the Justices concur.*

16